STATE of Wisconsin, Plaintiff-Respondent,

v.

Todd MITCHELL, Defendant-Appellant-Petitioner.

Supreme Court

*No. 90-2474-CR. Oral argument February 26, 1992.—Decided
June 23, 1992.*

(Also reported in 485 N.W.2d 807.)

153

154

For the defendant-appellant-petitioner there was a brief by *Bernard Goldstein,* Milwaukee and oral argument by *Bernard Goldstein.*

For the plaintiff-respondent the cause was argued by *Paul Lundsten,* assistant attorney general with whom on the brief was *James E. Doyle.*

Amicus curiae brief was filed by *Lynn Adelman, Pamela Moorshead* and *Adelman, Adelman & Murray, S.C.,* Milwaukee, for The National Association of Criminal Defense Lawyers, The Wisconsin Association of Criminal Defense Lawyers and the Wisconsin State Public Defender.

Amicus curiae brief was filed by *Robert H. Friebert, Cordelia S. Munroe, Peter K. Rofes* and *Freibert, Finerty & St. John, S.C.,* Milwaukee and *Ruth L. Lan-*

sner, Steven M. Freeman, Michael A. Sandberg, New York, New York for Anti-Defamation League of B'nai B'rith, The Milwaukee Jewish Council, The Wisconsin Jewish Conference, The Milwaukee Urban League, The Madison Urban League, Inc., The NAACP-Milwaukee Branch and The Madison Community United, Inc.

HEFFERNAN, CHIEF JUSTICE. This is a review of a published decision of the court of appeals, *State v. Mitchell*, 163 Wis. 2d 652, 473 N.W.2d 1 (Ct. App. 1991), which affirmed judgments of the circuit court for Kenosha county, Jerold W. Breitenbach, Circuit Judge, adjudging Todd Mitchell guilty of aggravated battery, party to a crime, and adjudging that Mitchell intentionally selected the battery victim because of the victim's race in violation of the hate crimes penalty enhancer, sec. 939.645, Stats. Mitchell challenged the constitutionality of the sec. 939.645, Stats., on appeal, and the court of appeals held that the statute was constitutional. We conclude that the statute unconstitutionally infringes upon free speech, and reverse the decision of the court of appeals.

The sole issue before the court is the constitutionality of sec. 939.645, Stats., the "hate crimes" statute.[1]

---

[1]At the time of Mitchell's crimes, sec. 939.645, Stats. 1989–90, provided:

**(1)** If a person does all of the following, the penalties for the underlying crime are increased as provided in sub. (2):

(a) Commits a crime under chs. 939 to 948.

(b) Intentionally selects the person against whom the crime under par. (a) is committed or selects the property which is damaged or otherwise affected by the crime under par. (a) because of the race, religion, color, disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property.

(2)(a) If the crime committed under sub. (1) is ordinarily a misdemeanor other than a Class A misdemeanor, the revised maxi-

Mitchell asserts that the statute on its face violates: (1) his right of free speech guaranteed by the First Amendment and (2) his right to due process and equal protection of the laws guaranteed by the Fourteenth Amendment. We hold that the statute violates the First Amendment and is thus unconstitutional.[2]

The facts are not in dispute. On October 7, 1989, a group of young black men and boys was gathered at an apartment complex in Kenosha. Todd Mitchell, nineteen at the time, was one of the older members of the group. Some of the group were at one point discussing a scene from the movie "Mississippi Burning" where a white man beat a young black boy who was praying.

Approximately ten members of the group moved outdoors, still talking about the movie. Mitchell asked the group: "Do you all feel hyped up to move on some white people?" A short time later, Gregory Reddick, a fourteen-year-old white male, approached the apartment

---

mum fine is $10,000 and the revised maximum period of imprisonment is one year in the county jail.

(b) If the crime committed under sub. (1) is ordinarily a Class A misdemeanor, the penalty increase under this section changes the status of the crime to a felony and the revised maximum fine is $10,000 and the revised maximum period of imprisonment is 2 years.

(c) If the crime committed under sub. (1) is a felony, the maximum fine prescribed by law for the crime may be increased by not more than $5,000 and the maximum period of imprisonment prescribed by law for the crime may be increased by not more than 5 years.

(3) This section provides for the enhancement of the penalties applicable for the underlying crime. The court shall direct that the trier of fact find a special verdict as to all of the issues specified in sub. (1).

(4) This section does not apply to any crime if proof of race, religion, color, disability, sexual orientation, national origin or ancestry is required for a conviction for that crime.

[2]Because of our holding, we do not address Mitchell's Fourteenth Amendment vagueness and equal protection claims.

complex. Reddick said nothing to the group, and merely walked by on the other side of the street. Mitchell then said: "You all want to fuck somebody up? There goes a white boy; go get him." Mitchell then counted to three and pointed the group in Reddick's direction.

The group ran towards Reddick, knocked him to the ground, beat him severely, and stole his "British Knights" tennis shoes. The police found Reddick unconscious a short while later. He remained in a coma for four days in the hospital, and the record indicates he suffered extensive injuries and possibly permanent brain damage.

Mitchell was convicted of aggravated battery, party to a crime. Sections 939.05 and 940.19(1m), Stats. The jury separately found that Mitchell intentionally selected Reddick as the battery victim because of Reddick's race. The aggravated battery conviction carried a maximum sentence of two years, secs. 940.19(1m) and 939.50(3)(e), Stats. Because the jury found that Mitchell selected Reddick because of Reddick's race, sec. 939.645(2)(c), Stats., increased the potential maximum sentence for aggravated battery to seven years. The trial court sentenced Mitchell to four years for the aggravated battery.[3]

After the circuit court denied Mitchell's request for post-conviction relief, Mitchell appealed the judgments of conviction and the sentences to the court of appeals, focusing on the constitutionality of the hate crimes stat-

_____

[3]Mitchell was also convicted of theft, party to a crime, sec. 943.20(1)(a) and (3)(d)2, Stats. The circuit court imposed and stayed a four year sentence for the theft conviction and imposed a four year period of consecutive probation. The circuit court did not find that the theft violated the hate crimes statute. The court of appeals rejected Mitchell's challenges to the theft conviction, *Mitchell,* 163 Wis. 2d at 664–65, and that portion of the court of appeals decision is not before the court.

ute. On June 5, 1991, the court of appeals affirmed the circuit court's judgments, concluding that Mitchell waived any equal protection challenge and that the hate crimes statute was neither vague nor overbroad. *State v. Mitchell,* 163 Wis. 2d 652, 473 N.W.2d 1 (Ct. App. 1991). We granted Mitchell's petition for review on the issue of the constitutionality of the hate crimes statute, and now reverse.[4]

This case presents an issue which has spawned a growing debate in this country: the constitutionality of legislation that seeks to address hate crimes. Numerous articles have been published concerning the issue, some applauding hate crimes statutes and some vigorously in opposition.[5] Individuals and organizations traditionally

---

[4]*Amicus curiae* briefs were filed with the court on behalf of two separate coalitions: the National Association of Criminal Defense Lawyers, the Wisconsin Association of Criminal Defense Lawyers and the Wisconsin State Public Defender; and the Anti-Defamation League of B'nai B'rith, the Milwaukee Jewish Council, the Wisconsin Jewish Conference, the Milwaukee Urban League, the Madison Urban League, Inc., the NAACP—Milwaukee Branch, and the Madison Community United, Inc.

[5]*See, e.g.,* Susan Gellman, *Sticks and Stones Can Put You in Jail, But Can Words Increase Your Sentence? Constitutional and Policy Dilemmas of Ethnic Intimidation Laws,* 39 U.C.L.A. L. Rev. 333 (1991); and Tanya Kateri Hernandez, *Bias Crimes: Unconscious Racism in the Prosecution of Racially Motivated Violence,* 99 Yale L.J. 845 (1990). Similarly, numerous courts and commentators are currently struggling with the constitutional implications of college campus "hate speech" rules. *See, e.g., UWM Post, Inc. v. Board of Regents,* 774 F. Supp. 1163 (E.D. Wis. 1991); *Doe v. University of Michigan,* 721 F. Supp. 852 (E.D. Mich. 1989); Charles R. Lawrence, *If He Hollers Let Him Go: Regulating Racist Speech on Campus,* 1990 Duke L.J. 431; Nadine Strossen, *Regulating Racist Speech on Campus: A Mod-*

allied behind the same agenda have separated on the issue of the legitimacy of hate crimes statutes. As one commentator noted:

> [T]he debate over these laws is occurring not merely between traditional allies, but between one side and itself. Moreover, whenever either viewpoint prevails, whether in the legislature, the courts, or even in a purely academic argument, its proponents do not seem to be very happy about it. They can see very well their opponents' point of view, and in fact largely agree with it. It is as if everyone involved in the debate over the permissibility and desirability of ethnic intimidation laws were actually on *both* sides at once.

Susan Gellman, 39 U.C.L.A. L. Rev. at 334 (emphasis in original).

Statistical sources indicate that incidents of all types of bias related crime are on the rise. Joseph M. Fernandez, *Bringing Hate Crime Into Focus—The Hate Crimes Statistics Act of 1990,* 26 Harv. C.R.–C.L. L. Rev. 261 (1991); Tanya Kateri Hernandez, *Bias Crimes: Unconscious Racism in the Prosecution of Racially Motivated Violence,* 99 Yale L.J. 845, 845–46 (1990). Between 1980 and 1986, three thousand incidents of bias related violence were documented. *Id.* at 846. The Anti-Defamation League of B'nai B'rith (ADL) reports that "[d]uring 1990 there were 1685 anti-Semitic incidents reported to the Anti-Defamation League from 40 states and the District of Columbia." 1990 Audit of Anti-Semitic Incidents, Anti-Defamation League of B'nai B'rith 1 (1990). This was the highest total ever reported

---

*est Proposal?,* 1990 Duke L.J. 484; and Katherine T. Bartlett and Jean O'Barr, *The Chilly Climate on College Campuses: An Expansion of the "Hate Speech" Debate,* 1990 Duke L.J. 574.

161

in the twelve year history of the audit. *Id.* The National Gay and Lesbian Task Force reported 7031 incidents of anti-gay violence in 1989. Anti-Violence Project, National Gay and Lesbian Task Force (NGLTF), Anti-Gay Violence, Victimization and Defamation in 1989 (1990). *See also* Developments in the Law—Sexual Orientation and the Law, 102 Harv. L. Rev. 1508, 1541–42 (1989).

In response to the recent rise in hate crimes, the United States Congress enacted the Hate Crimes Statistics Act of 1990, Pub. L. No. 101–275. The purpose of the Act is to establish a national data collection system for compilation of statistics concerning bias-related crimes. The Act requires the Attorney General to publish an annual summary of the findings. *See generally,* Fernandez, *supra.*

At the state level, the response to reports of bias related crime has been significant. Nearly every state in the country has enacted some form of hate crime legislation. *See* ADL Law Report: Hate Crimes Statutes: A 1991 Status Report, Appendix C, pp. 24–26 (1991). The Wisconsin legislature's response was to enact sec. 939.645, Stats., which enhances the potential penalty for a criminal actor if the state proves that the actor intentionally selected the victim because of the victim's race, religion, color, disability, sexual orientation, national origin or ancestry.

The first step in reviewing a constitutional challenge to a statute is to determine which party bears the burden of proving its constitutionality or unconstitutionality. While the party challenging the statute ordinarily bears the burden of proving beyond a reasonable doubt that the statute is unconstitutional, *Bachowski v. Salamone,* 139 Wis. 2d 397, 404, 407 N.W.2d 533 (1987),

the burden shifts to the proponent of the statute to establish its constitutionality when the statute encroaches upon First Amendment rights. *City of Madison v. Baumann,* 162 Wis. 2d 660, 669, 470 N.W.2d 296 (1991). Because the hate crimes statute punishes the defendant's biased thought, as discussed below, and thus encroaches upon First Amendment rights, the burden is upon the state to prove its constitutionality.

The hate crimes statute violates the First Amendment directly by punishing what the legislature has deemed to be offensive thought and violates the First Amendment indirectly by chilling free speech.

The First Amendment of the United States Constitution states bluntly: "Congress shall make no law . . . abridging the freedom of speech."[6] The First Amendment protects not only speech but thought as well. "[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Abood v. Detroit Bd. of Education,* 431 U.S. 209, 234–35 (1977). Even more fundamentally, the constitution protects all speech and thought, regardless of how offensive it may be. "[I]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989).[7] As Justice Holmes

[6]Article I, section 3 of the Wisconsin Constitution provides in equally sweeping language that "no laws shall be passed to restrain or abridge the liberty of speech."

[7]*See also R.A.V. v. City of St. Paul,* No. 90-7675, 1992 LEXIS 3863, at *9, — U.S. — (June 22, 1992); *Hustler Magazine,*

put it: "If there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought—not free thought for those who agree with us but freedom for the thought we hate." *United States v. Schwimmer,* 279 U.S. 644, 654–55 (1929) (Holmes, J., dissenting), *overruled, Girouard v. United States,* 328 U.S. 61 (1946).[8]

Without doubt the hate crimes statute punishes bigoted thought. The state asserts that the statute punishes only the "conduct" of intentional selection of a victim. We disagree. Selection of a victim is an element of the underlying offense, part of the defendant's "intent" in committing the crime. In any assault upon an individual there is a selection of the victim. The statute punishes the "because of" aspect of the defendant's selection, the *reason* the defendant selected the victim, the *motive* behind the selection.

Construing the model hate crimes statute designed by the Anti-Defamation League of B'nai B'rith (ADL),

---

*Inc. v. Falwell,* 485 U.S. 46, 55–56 (1988); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 72 (1983); *Carey v. Brown,* 447 U.S. 455, 462–63 (1980); *FCC v. Pacifica Foundation,* 438 U.S. 726, 745–46 (1978); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63–65, 67–68 (1976) (plurality opinion); *Buckley v. Valeo,* 424 U.S. 1, 16–17 (1976); *Grayned v. Rockford,* 408 U.S. 104, 115 (1972); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972); *Bachellar v. Maryland,* 397 U.S. 564, 567 (1970); *United States v. O'Brien,* 391 U.S. 367, 382 (1968); *Brown v. Louisiana,* 383 U.S. 131, 142–43 (1966); and *Stromberg v. California,* 283 U.S. 359, 368–69 (1931).

[8]As was said in a statement attributed to Voltaire, surely one of the philosophical ancestors of our American constitution: "I disapprove of what you say but I will defend to the death your right to say it."

upon which the Wisconsin hate crimes statute is apparently loosely based,[9] one author provides the following insightful analysis:

> Under the ADL model, a charge of ethnic intimidation must always be predicated on certain offenses proscribed elsewhere in a state's criminal code. As those offenses are already punishable, all that remains is an additional penalty for the actor's *reasons* for his or her actions. The model statute does not address effects, state of mind, or a change in the character of the offense, but only the thoughts and ideas that propelled the actor to act. The government could not, of course, punish these thoughts and ideas independently. That they are held by one who commits a crime because of his or her beliefs does not remove this constitutional shield. Of course, the First Amendment protection guaranteed the actor's thoughts does not protect him or her from prosecution for the associated action. Neither, however, does the state's power to punish the action remove the constitutional barrier to punishing the thoughts.

---

[9]The ADL model statute provides:

A.  A person commits the crime of intimidation if, *by reason of* the actual or perceived race, color, religion, national origin or sexual orientation of another individual or group of individuals, he violates Section ——— of the Penal Code (insert code provision for criminal trespass, criminal mischief, harassment, menacing, assault and/or other appropriate statutorily proscribed criminal conduct).

B.  Intimidation is a ——— misdemeanor/felony (the degree of the criminal liability should be at least one degree more serious than that imposed for commission of the offense).

ADL Law Report: Hate Crimes Statutes: A 1991 Status Report, p. 4 (1991) (emphasis added). While the Wisconsin statute substitutes the phrase "because of" for "by reason of," it is clear that both statutes are concerned with the actor's reason or motive for acting.

165

Susan Gellman, 39 U.C.L.A. L. Rev. 333, 363 (1991).[10] Because all of the crimes under chs. 939 to 948, Stats., are already punishable, all that remains is an additional punishment for the defendant's motive in selecting the victim. The punishment of the defendant's bigoted motive by the hate crimes statute directly implicates and encroaches upon First Amendment rights.

While the statute does not specifically phrase the "because of . . . race, religion, color, [etc.]" element in terms of bias or prejudice, it is clear from the history of anti-bias statutes, detailed above, that sec. 939.645, Stats., is expressly aimed at the bigoted bias of the actor. Merely because the statute refers in a literal sense to the

---

[10]*See also State v. Beebe,* 67 Or. App. 738, 680 P.2d 11 (1984). In *Beebe,* the Court of Appeals of Oregon interpreted an ethnic intimidation statute fashioned after the ADL model, ORS 166.155(1), and recognized that the statute punished motive:

> The statute does not offer more protection to any class of victims. Anyone may be a victim of bigotry. It is the defendant who classifies, and he does so by his *motive.* The statute distinguishes between acts of harassment which are *motivated by racial, ethnic or religious animus* and acts of harassment which are not so motivated.

*Id.* at 13 (emphasis added). In *People v. Grupe,* 141 Misc. 2d 6, 532 N.Y.S.2d 815 (N.Y. Crim. Ct. 1988), the court interpreted New York's hate crimes statute which prohibits persons from subjecting persons to physical contact "because of" their protected status. In that case, the court stated: "Section 240.30(3), both on its face and as applied in this case, regulates violent conduct, and physical intimidation, when committed intentionally *and because of racial, religious or ethnic prejudice." Id.* at 817 (emphasis added). Finally, in *Kinser v. State,* 88 Md. App. 17, 591 A.2d 894, 896 (1991), the court upheld a conviction under Maryland's hate crimes statute, Md. Ann. Code art. 27, § 470A(b)(3) (Supp. 1990), in part because the defendant's conduct "overwhelmingly demonstrate[d] his actions were *motivated by racial animus."* (Emphasis added.)

intentional "conduct" of selecting, does not mean the court must turn a blind eye to the intent and practical effect of the law—punishment of offensive motive or thought.[11] The conduct of "selecting" is not akin to the

---

[11]There seems to be considerable confusion regarding the meaning and effect of "motive" in criminal law. As Black's Law Dictionary 810 (6th ed. 1990) states in its definition of "intent":

> Intent and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

This confusion is manifested clearly in the dissenting opinion of Justice Bablitch, which correctly defines "intentionally" at pp. 197–198 as "a purpose to do the thing or cause the result specified," correctly recognizes at pp. 187–188 n.2 that the term "because of" implicates an actor's motive, and somehow concludes that the hate crimes statute involves ordinary criminal intent.

In this case the crime was aggravated battery, and the necessary intent under sec. 940.19(1m), Stats., is an "intent to cause great bodily harm." Quite clearly, Mitchell's intent to cause great bodily harm to Reddick is distinct from his motive or reason for doing so. Criminal law is not concerned with a person's reasons for committing crimes, but rather with the actor's intent or purpose in doing so.

As explained by Professor Gellman:

> "Motive," "intent," and "purpose" are related concepts in that they all refer to thought processes. They are legally distinct in crucial respects, however. Motive is nothing more than an actor's reason for acting, the "why" as opposed to the "what" of conduct. Unlike purpose or intent, motive cannot be a criminal offense or an element of an offense.
>
> . . ..
>
> The distinction becomes more clear upon consideration of the effect of altering the intent or purpose on the legal characterization of the same conduct, as compared to the effect (or lack thereof) of altering the motive. Continuing with the example of burglary, changing the *purpose* of the break-in changes the very nature of the act: if

167

conduct of assaulting, burglarizing, murdering and other criminal conduct. It cannot be objectively established. Rather, an examination of the intentional "selection" of a victim necessarily requires a subjective examination of the actor's motive or reason for singling out the particular person against whom he or she commits a crime.[12]

> *A* broke into *B*'s house for the purpose of getting *A*'s own property (not a criminal purpose), the act of breaking in is simply breaking and entering or trespass, not burglary, even if *A*'s motive was identical (the desire to pay his debts). By contrast, changing *A*'s *motives,* even to more sympathetic ones (say, the desire to buy a house for the homeless), while his *purpose* was that of committing the crime of theft in *B*'s house, does *not* change the nature of the act: it is still burglary.

Susan Gellman, 39 U.C.L.A. L. Rev. at 364–65 (emphasis in original). While the state speaks of the "intentional" aspect of the hate crimes statute, when the focus is on the "selects . . . because of" aspect of the law, it becomes clear that it is the actor's motive which is targeted and punished by the statute.

[12]In fact, on May 13, 1992, the legislature amended sec. 939.645, Stats., to apply specifically where the selection is "in whole or in part because of the actor's belief or perception regarding" the victim's status "whether or not the actor's belief or perception was correct." 1991 Wis. Act 291. Sections 939.645(1)(b) and (4), Stats., currently provide (with the substantive changes highlighted):

> (1)(b)  Intentionally selects the person against whom the crime under par. (a) is committed or selects the property that is damaged or otherwise affected by the crime under par. (a) *in whole or in part* because of *the actor's belief or perception regarding* the race, religion, color, disability, sexual orientation, national origin or ancestry of that person or the owner or occupant of that property, *whether or not the actor's belief or perception was correct.*
>
> (4)  This section does not apply to any crime if proof of race, religion, color, disability, sexual orientation, national origin or ancestry *or proof of any person's perception or belief regarding another's race, religion, color, disability, sexual orientation, national origin or ancestry* is required for a conviction for that crime.

In this case, Todd Mitchell selected Gregory Reddick because Reddick is white. Mitchell is black. The circumstantial evidence relied upon to prove that Mitchell selected Reddick "because" Reddick is white included Mitchell's speech—"Do you all feel hyped up to move on some white people?"—and his recent discussion with other black youths of a racially charged scene from the movie "Mississippi Burning." This evidence was used not merely to show the intentional selection of the victim, but was used to prove Mitchell's bigoted bias. The physical assault of Reddick is the same whether he was attacked because of his skin color or because he was wearing "British Knight" tennis shoes. Mitchell's bigoted motivation for selecting Reddick, his thought which impelled him to act, is the reason that his punishment was enhanced. In Mitchell's case, that motivation was apparently a hatred of whites.[13]

The statute commendably is designed to punish—and thereby deter—racism and other objectionable biases, but deplorably unconstitutionally infringes upon free speech. The state would justify its transgression against the constitutional right of freedom of speech and thought because its motive is a good one, but the magnitude of the proposed incursion against the constitutional

---

Thus the legislature has removed any doubt that the aim of the statute is the actor's subjective motivation. The dissenting opinions ignore this legislative clarification in their refusal to recognize that the statute is focused upon and punishes the defendant's motive.

[13]While the statute as written may extend to situations where the actor in fact is not biased, this does not save the statute. The legislature may not subvert a constitutional freedom—even one as opprobrious as the right to be a bigot—by carefully wording a statute to affect more than simply that freedom.

rights of all of us should no more be diminished for that good motive than should a crime be enhanced by a separate penalty because of a criminal's bad motive.[14]

The state admits that this case involves legislation that seeks to address bias related crime. The only definition of "bias" relevant to this case is "prejudice." A statute specifically designed to punish personal prejudice impermissibly infringes upon an individual's First Amendment rights, no matter how carefully or cleverly one words the statute. The hate crimes statute enhances the punishment of bigoted criminals because they are bigoted. The statute is directed solely at the subjective motivation of the actor—his or her prejudice. Punishment of one's thought, however repugnant the thought, is unconstitutional.[15]

---

[14]As has long been recognized, the road to hell is paved with good intentions. See George Herbert, *Jacula Prudentum* (1640); Samuel Johnson, from James Boswell, *Life of Dr. Johnson* (1791); George Bernard Shaw, *Maxims for Revolutionists;* and others. Or as the latin poet Virgil said in the *Aeneid* in a reference to the slippery slope, "Facilis descensus Averno," which liberally translated means "Beware that first false step." Eugene Ehrlich, *Nil Desperandum* 107 (Guild Publishing 1987).

[15]Of course, freedom of speech is not absolute. For example, the government may regulate or punish "fighting words" that are "likely to provoke the average person to retaliation, and thereby cause a breach of the peace." *Chaplinsky v. New Hampshire,* 315 U.S. 568, 574 (1942). Also, the government may regulate expressive conduct where there is an important governmental interest and the regulation is narrowly tailored to address that interest. *United States v. O'Brien,* 391 U.S. 367, 376 (1968). The bigoted thought which is punished by the hate crimes statute fits neither category. While an individual's bigoted speech may occasionally provoke retaliation, a person's thought will not. Nor is it argued that a hate crime is protected expressive conduct. It is not.

In *R.A.V., supra,* decided June 22, 1992, the United States Supreme Court held that a Minnesota ordinance prohibiting bias-motivated disorderly conduct[16] was facially invalid under the First Amendment. Accepting the Minnesota Supreme Court's determination that the ordinance reached only expressions that constituted "fighting words" within the meaning of *Chaplinsky,* the Court held that the government may not constitutionally regulate even otherwise unprotected speech on the basis of hostility towards the idea expressed by the speaker. *R.A.V.,* 1992 U.S. LEXIS 3863, at *24-28. In other words, while the government may regulate all fighting words, it may not regulate only those fighting words with which it disagrees. Such a prohibition is nothing more than a governmental attempt to silence speech on the basis of its content. *Id.* at *26.

. While the St. Paul ordinance invalidated in *R.A.V.* is clearly distinguishable from the hate crimes statute in that it regulates fighting words rather than merely the actor's biased motive, the Court's analysis lends support to our conclusion that the Wisconsin legislature cannot criminalize bigoted thought with which it disagrees. The Court stated:

Rather, a person's bigoted thought, the very thing punished by the hate crimes statute, is entitled to the full protection of the First Amendment.

[16]The ordinance, St. Paul, Minn. Legis. Code § 292.02 (1990), provided:

Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.

171

> [T]he only interest distinctively served by the content limitation is that of displaying the city council's special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids. The politicians of St. Paul are entitled to express that hostility—but not through the means of imposing unique limitations upon speakers who (however benightedly) disagree.

*Id.* at \*32–33 (footnote omitted). The ideological content of the thought targeted by the hate crimes statute is identical to that targeted by the St. Paul ordinance—racial or other discriminatory animus. And, like the United States Supreme Court, we conclude that the legislature may not single out and punish that ideological content.

Thus, the hate crimes statute is facially invalid because it directly punishes a defendant's constitutionally protected thought.[17]

The hate crimes statute is also unconstitutionally overbroad. A statute is overbroad when it intrudes upon a substantial amount of constitutionally protected activity. Aside from punishing thought, the hate crimes stat-

---

[17]The dissent of Justice Bablitch asserts that punishing motive is permissible, based upon *Dawson v. Delaware*, 90–6704 (U.S. Supreme Court, March 9, 1992), wherein the United States Supreme Court indicated that evidence of a convicted murderer's bigoted motivation in committing the murder is a relevant inquiry in sentencing. Dissenting op. at 192–193. The dissent is wrong. Of course it is permissible to consider evil motive or moral turpitude when sentencing for a particular crime, but it is quite a different matter to sentence for that underlying crime and then add to that criminal sentence a separate enhancer that is directed solely to punish the evil motive for the crime.

172

ute also threatens to directly punish an individual's speech and assuredly will have a chilling effect upon free speech. As we explained in *Bachowski:*

> A [statute] is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to constitutionally protected conduct which the state is not permitted to regulate. The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from exercising their protected constitutional freedoms, the so-called "chilling effect."

*Bachowski*, 139 Wis. 2d at 411 (citations omitted). The chilling effect need not be evident in the defendant's case; it is enough if hypothetical situations show that it will chill the rights of others. *Milwaukee v. Wilson*, 96 Wis. 2d 11, 19-20, 291 N.W.2d 452 (1980). Finally, "[i]n the First Amendment context, 'criminal statutes must be scrutinized with particular care . . ..' " *R.A.V.*, 1992 U.S. LEXIS 3863, at *63, (White, J., concurring), *citing Houston v. Hill*, 482 U.S. 451, 459 (1987).[18]

The state admits as it must that speech may often be used as circumstantial evidence to prove the actor's intentional selection. This case is a perfect example. Mitchell's speech is the primary evidence of his intentional selection of Reddick. The use of the defendant's speech, both current and past, as circumstantial evidence to prove the intentional selection, makes it appar-

---

[18]In *R.A.V.*, four Justices disagreed with the analysis of the majority, but concurred in the judgment because they concluded that the Minnesota ordinance is fatally overbroad because it "makes criminal expressive conduct that causes only hurt feelings, offense, or resentment, and is protected by the First Amendment." *R.A.V.*, 1992 U.S. LEXIS 3863, at *58-64 (White, J., concurring).

ent that the statute sweeps protected speech within its ambit and will chill free speech.

The criminal conduct involved in any crime giving rise to the hate crimes penalty enhancer is already punishable. Yet there are numerous instances where this statute can be applied to convert a misdemeanor to a felony merely because of the spoken word. For example, if A strikes B in the face he commits a criminal battery. However, should A add a word such as "nigger," "honkey," "jew," "mick," "kraut," "spic," or "queer," the crime becomes a felony, and A will be punished not for his conduct alone—a misdemeanor—but for using the spoken word. Obviously, the state would respond that the speech is merely an indication that A intentionally selected B because of his particular race or ethnicity, but the fact remains that the necessity to use speech to prove this intentional selection threatens to chill free speech. Opprobrious though the speech may be, an individual must be allowed to utter it without fear of punishment by the state.

And of course the chilling effect goes further than merely deterring an individual from uttering a racial epithet during a battery. Because the circumstantial evidence required to prove the intentional selection is limited only by the relevancy rules of the evidence code, the hate crimes statute will chill every kind of speech. As Professor Gellman explains:

> In addition to any words that a person may speak during, just prior to, or in association with the commission of one of the underlying offenses, all of his or her remarks upon earlier occasions, any books ever read, speakers ever listened to, or associations ever held could be introduced as evidence that he or she held racist views and was acting upon them at the time of the offense. Anyone charged with one of the

174

underlying offenses could be charged with [intentional selection] as well, and face the possibility of public scrutiny of a lifetime of everything from ethnic jokes to serious intellectual inquiry. Awareness of this possibility could lead to habitual self-censorship of expression of one's ideas, and reluctance to read or listen publicly to the ideas of others, whenever one fears that those ideas might run contrary to popular sentiment on the subject of ethnic relations.

. . .

It is no answer that one need only refrain from committing one of the underlying offenses to avoid the thought punishment. Chill of expression and inquiry by definition occurs *before* any offense is committed, and even if no offense is *ever* committed. The chilling effect thus extends to the entire populace, not just to those who will eventually commit one of the underlying offenses.

Susan Gellman, 39 U.C.L.A. L. Rev. at 360–61 (emphasis in original) (citations omitted).[19]

Thus, the hate crimes statute is unconstitutionally overbroad because it sweeps protected First Amendment speech within its reach and thereby chills free speech.

Finally, we consider the argument advanced by the *amici curiae* ADL, et al., and embraced by the dissent that an analogy exists between the hate crimes statute and antidiscrimination laws, and that the numerous United States Supreme Court decisions upholding antidiscrimination laws lend support to the hate crimes

---

[19]*See, e.g., Grimm v. Churchill,* 932 F.2d 674, 675–76 (7th Cir. 1991) (fact that arresting officer in ethnic intimidation case "had heard through his brother-in-law that Grimm had a history of making racial insults and engaging in racial confrontations" supported conclusion that officer had probable cause to arrest).

statute.[20] We disagree.

Discrimination and bigotry are not the same thing. Under antidiscrimination statutes, it is the discriminatory act which is prohibited. Under the hate crimes statute, the "selection" which is punished is not an act, it is a mental process. In this case, the act was the battery of Reddick; what was punished by the hate crimes statute was Mitchell's reason for selecting Reddick, his discriminatory motive.

As explained above, selection under the hate crimes statute is solely concerned with the subjective motivation of the actor. Prohibited acts of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, and analogous state antidiscrimination statutes, such as refusal to hire, termination, etc., involve objective acts of discrimination. What is punished by the hate crimes penalty enhancer is a subjective mental process, not an objective act. The actor's penalty is enhanced not because the actor fired the victim, terminated the victim's employment, harassed the victim, abused the victim or otherwise objectively mistreated the victim because of the victim's protected status; the penalty is enhanced because the actor subjectively selected the victim because of the victim's protected status. Selection, quite simply, is a mental process, not an objective act.[21]

---

[20]*See, e.g., Roberts v. United States Jaycees,* 468 U.S. 609 (1984); *Hishon v. King & Spalding,* 467 U.S. 69 (1984); and *Runyan v. McCrary,* 427 U.S. 160 (1976).

[21]The dissenting opinion of Justice Bablitch recites that it does not understand this "very complicated and elaborate distinction" between the hate crimes penalty enhancer and antidiscrimination statutes. That is interesting in light of the dissent's recognition at 200 that the statute applies to the defendant's "selection decision," an obviously subjective mental process. To

Finally, there is a difference between the civil penalties imposed under Title VII and other antidiscrimination statutes and the criminal penalties imposed by the hate crimes law, and contrary to the dissent's protestations, it is a difference that matters.[22] The difference is that while the First Amendment may countenance slight incursions into free speech where the overarching concern is protection from objective acts of bigotry in the employment marketplace and the adverse consequences of such acts on the civil rights of minorities, the First Amendment will not allow the outright criminalization of subjective bigoted thought. We have little doubt that an antidiscrimination statute which criminalized an employer's subjective discrimination, with nothing more, would be unconstitutional. This apparent schism in the First Amendment's protective shield is perhaps best understood in the context of overbreadth. A statute criminalizing the bigoted selection of a victim will chill free speech to a much greater extent than a statute

state that a "decision" is analogous to the conduct proscribed by antidiscrimination statutes is untenable. We freely admit that antidiscrimination statutes are concerned with the actor's motive, but it is the objective conduct taken in respect to the victim which is redressed (not punished) by those statutes, not the actor's motive.

We repeat. The hate crimes statute does not punish the underlying criminal act, it punishes the defendant's motive for acting. Taking the dissent's explanation that the statute is concerned with the "decision" of the defendant, it is clear that the hate crimes statute creates nothing more than a thought crime. Apparently that dissent is comfortable with such an Orwellian notion; we are not.

[22]*See* Bablitch, J., dissenting, at 187 n.2, 189 n.3, 191 and 192.

imposing civil penalties for objective discriminatory acts.

In the wake of the Los Angeles riots sparked by the acquittal of four white police officers accused of illegally beating black motorist Rodney King, it is increasingly evident that racial antagonism and violence are as prevalent now as they ever have been. Indeed, added to the statistical compilation of bias related crimes could be the vicious beating of white truck driver Reginald Denny by black rioters, horrifyingly captured on film by a news helicopter. As disgraceful and deplorable as these and other hate crimes are, the personal prejudices of the attackers are protected by the First Amendment. The constitution may not embrace or encourage bigoted and hateful thoughts, but it surely protects them.

Because we wholeheartedly agree with the motivation of the legislature in its desire to suppress hate crimes, it is with great regret that we hold the hate crimes statute unconstitutional—and only because we believe that the greater evil is the suppression of freedom of speech for all of us.

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded to the circuit court for resentencing on the aggravated battery conviction.

SHIRLEY S. ABRAHAMSON, J. *(dissenting).* Today, this court concludes that sec. 939.645, Stats. 1989–90, is unconstitutional, holding that it violates the First Amendment right to freedom of speech.[1]

The Constitution teaches mistrust of any government regulation of speech or expression. Had I been in the legislature, I do not believe I would have supported this statute because I do not think this statute will

---

[1] 1991 Wis. Act 291 is not before us.

accomplish its goal. I would direct the state's efforts to protect people from invidious discrimination and intimidation into other channels. As a judge, however, after much vacillation, I conclude that this law should be construed narrowly and should be held constitutional.

This case presents a very difficult question involving the convergence of three competing societal values—freedom of speech, equal rights, and protection against crime.

Freedom of speech is the most treasured right in a free, democratic society. Our constitution protects our right to think, speak and write as we wish. This freedom of expression encompasses all speech, pleasant or unpleasant, popular or unpopular. Even expressions of bigotry are protected. Our constitutional history makes clear that expression hostile to the values of our country should be addressed with more speech, not suppressed with police power.

Nevertheless, our law recognizes the harmful effects of invidious classification and discrimination. We acknowledge that when individuals are victimized because of their status, such as race or religion, the resulting harm is greater than the harm that would have been caused by the injurious conduct alone. In addition to the injury inflicted, the victim may suffer feelings of fear, shame, isolation and inability to enjoy the rights and opportunities that should be available to all persons. Furthermore, all members of the group to which the victim belongs may suffer when the individual is victimized. The state has determined that harms inflicted because of race, color, creed, religion or sexual orientation are more pressing public concerns than other harms. The state has legitimate, reasonable and neutral justifi-

179

cations for selective protection of certain people.[2] "In light of our Nation's long and painful experience with discrimination, this determination is plainly reasonable. Indeed . . . it is compelling."[3] The state has a compelling interest in combating invidiously discriminatory conduct, even when the conduct is linked to viewpoints otherwise protected by the First Amendment.

In addition, our government has a compelling interest in preserving the peace, in protecting each person from crime and from the fear of crime.

Section 939.645 addresses only those crimes committed "because of" the victim's "race, religion, color, disability, sexual orientation, national origin or ancestry." It does not punish all crimes committed by persons who have expressed bigoted beliefs. An individual may commit a criminal act. That same individual may possess or express bigoted beliefs. These two facts standing alone, however, do not subject that individual to punishment under sec. 939.645.

In my mind, it is the tight nexus between the selection of the victim and the underlying crime that saves this statute. The state must prove beyond a reasonable doubt both that the defendant committed the underlying crime and that the defendant intentionally selected the victim because of characteristics protected under the statute. To prove intentional selection of the victim, the state cannot use evidence that the defendant has bigoted beliefs or has made bigoted statements unrelated to the particular crime. Evidence of a person's traits or beliefs would not be permissible for the purpose of proving the person acted in conformity therewith on a particular

[2]*R.A.V. v. City of St. Paul,* 1992 U.S. LEXIS 3863, — U.S. — (June 22, 1992) (*67, *81-*82, Stevens, J., concurring).

[3]*R.A.V. v. City of St. Paul,* 1992 U.S. LEXIS 3863, — U.S. — (June 22, 1992) (*51, White, J., concurring).

occasion. The statute requires the state to show evidence of bigotry relating directly to the defendant's intentional selection of this particular victim upon whom to commit the charged crime. The state must directly link the defendant's bigotry to the invidiously discriminatory selection of the victim and to the commission of the underlying crime.

Interpreted in this way, I believe the Wisconsin statute ties discriminatory selection of a victim to conduct already punishable by state law in a manner sufficient to prevent erosion of First Amendment protection of bigoted speech and ideas.

Read narrowly as the legislature intended, this statute is a prohibition on conduct, not on belief or expression. The statute does nothing more than assign consequences to invidiously discriminatory acts.

The state's interest in punishing bias-related criminal conduct relates only to the protection of equal rights and the prevention of crime, not to the suppression of free expression. The enhanced punishment justly reflects the crime's enhanced negative consequences on society. Thus interpreted the statute prohibits intentional conduct, not belief or expression. The only chilling effect is on lawless conduct.

Bigots are free to think and express themselves as they wish, except that they may not engage in criminal conduct in furtherance of their beliefs. Section 939.645 does not punish abstract beliefs or speech. The defendant's beliefs or speech are only relevant as they relate directly to the commission of a crime.

The United States Supreme Court's recent decision in *R.A.V. v. City of St. Paul,* 1992 U.S. LEXIS 3863, — U.S. — (June 22, 1992), has not persuaded me to the contrary. In *R.A.V.,* the Supreme Court held unconstitutional a St. Paul ordinance prohibiting placing "on pub-

lic or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reason to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender . . .." The majority opinion in *R.A.V.* ruled the ordinance facially unconstitutional because, even assuming that the ordinance only regulated "fighting words," the ordinance was based on the content of the ideas expressed by a defendant. The four concurring justices found the ordinance unconstitutional on the ground that the statute was an overbroad prohibition of fighting words.

*R.A.V.* does not control this case. Section 939.645 is not similar to the St. Paul ordinance; its validity does not rely on the "fighting words" doctrine. The defendant in *R.A.V.* was also charged under a state statute, sec. 609.2231(4), Minn. Stats. 1990, much more similar to sec. 939.645 than the St. Paul ordinance, but the defendant did not challenge that charge.

For the reasons set forth, I dissent.

WILLIAM A. BABLITCH, J. *(dissenting).*

> everywhere the crosses are burning, sharp-shooting goose-steppers around every corner, there are snipers in the schools . . . (I know you don't believe this. You think this is nothing but faddish exaggeration. But they are not shooting at you.)
>
> Lorna Dee Cervantes[1]

The law in question is not a "hate speech" law.

---

[1]Cervantes, Poem for the Young White Man Who Asked Me How I, An Intelligent Well Read Person Could Believe in the War Between Races, in M. Sanchez, Contemporary Chicana Poetry 90 (1986).

Nor is it really a "hate crimes" law as it has been somewhat inappropriately named.

It is a law against discrimination—discrimination in the selection of a crime victim.

Today the majority decides that the same Constitution which does not protect discrimination in the marketplace does protect discrimination that takes place during the commission of a crime. Numerous federal and state laws exist which prohibit discrimination in the selection of who is to be hired, or fired, or promoted. No one seriously (at least until today) questions their constitutionality. Yet the majority today gives constitutional protection to discrimination in the selection of who is to be the victim of a crime. Both sets of laws involve discrimination, both involve victims, both involve action "because of" the victim's status.

The majority says there is a difference in the two types of laws. They are wrong. There is no support in law or logic for their position. How can the Constitution not protect discrimination in the selection of a victim for discriminatory hiring, firing, or promotional practices, and at the same time protect discrimination in the selection of a victim for criminal activity? How can the Constitution protect discrimination in the performance of an illegal act and not protect discrimination in the performance of an otherwise legal act? How can the Constitution not protect discrimination in the marketplace when the action is taken "because of" the victim's status, and at the same time protect discrimination in a street or back alley when the criminal action is taken "because of" the victim's status?

These are laws against discrimination, pure and simple. Dictionaries do not disagree on the meaning of the term discrimination: to distinguish, to differentiate, to act on the basis of prejudice. Laws forbidding discrim-

183

ination in the marketplace and laws forbidding discrimination in criminal activity have a common denominator: they are triggered when a person acts "because of" the victim's protected status. These exact words appear in most, if not all antidiscrimination laws. These exact words appear in the laws before us today.

Yet the majority says one is constitutional, one is not. I submit it is pure sophistry to distinguish the two. In its effort to protect speech, the majority's constitutional pen gets too close to the trees and fails to see the forest.

The majority rationalizes their conclusion by insisting that this statute punishes bigoted thought. Not so. The statute does not impede or punish the right of persons to have bigoted thoughts or to express themselves in a bigoted fashion or otherwise, regarding the race, religion, or other status of a person. It does attempt to limit the effects of bigotry. What the statute does punish is acting upon those thoughts. It punishes the act of discriminatory selection plus criminal conduct, not the thought or expression of bigotry. The Constitution allows a person to have bigoted thoughts and to express them, but it does not allow a person to act on them. The majority says otherwise. I disagree.

I conclude the statute in question is neither vague nor overbroad, nor does it offend equal protection. Accordingly, I dissent.

I.

Examples of shocking bias related crimes making headlines recently include:

[A] white man assaults a black woman, rips off her clothes, douses her with lighter fluid and, yelling 'nigger', threatens to set her on fire.

184

According to police in a Washington suburb, the attack capped a night in which two young white men planned to hunt down blacks in revenge for being called 'honkies', a derogatory term blacks use for whites.

They pounced on two black women walking towards a shopping centre early in the morning. One escaped and ran for help, the other was beaten, stripped nearly naked, and sprayed with lighter fluid. Bernd Debusmann, *Hate Crime Shocks Washington, Shows Race Problems,* Reuters, March 4, 1992.

In Kentucky this September, assailants beat a young gay man with a tire iron, locked him into a car trunk with a bunch of snapping turtles and then tried to set the car on fire. He was left with severe brain damage. Neal R. Peirce, *Recurring Nightmare of Hate Crimes,* National Journal, December 15, 1990, at Section State of the States; Vol. 22 No. 50 p. 3045.

Amber Jefferson, a 15 year-old high school cheerleader in Orange County, Calif., almost lost her life because of the fact that she has one white and one black parent. Four attackers, allegedly all white, beat her with a baseball bat and split her face open with a shard of plate glass. Surgery to fix the wounds took 10 hours. It will be two years before she regains muscle control in her face. *Id.*

The 120 boys at Valley Torah High typically spend half their school day in college prep classes and half in religious instruction.

But for the past week—since their school was painted with swastikas, Ku Klux Klan symbols and Jewish slurs—they have been getting an education in hate. Sally Ann Stewart, *Hate Crimes: 'Litany of shame'* Incidents on rise in California, USA Today, March 13, 1992, at 3A.

Wisconsin has also not been immune from reprehensible incidents of bias related crime:

Anti-Semitic attacks erupt regularly, even at such supposedly progressive, enlightened institutions as the University of Wisconsin (Madison), where a Jewish student center has been pelted with rocks and bottles and where Jewish fraternities and sororities have been vandalized. Counselors at a Madison Jewish day camp discovered that the brake linings had been cut on a bus used to transport children—fortunately before the bus was used. A Madison synagogue, after repeated anti-Semitic incidents, was kept under armed guard for a time. *Recurring Nightmare of Hate Crimes,* National Journal, December 15, 1990, at Section State of the States; Vol. 22 No. 50 p. 3045.

In 1987, the Wisconsin legislature acted to alleviate bias related crime. The Wisconsin legislature's response was to enact sec. 939.645, Stats., which enhances the penalty a perpetrator receives if the State of Wisconsin (State) proves that the perpetrator intentionally selected the victim because of the victim's race, religion, color, or other protected status.

I first address Mitchell's and the majority's overbreadth argument. A statute is overbroad when its language, given its normal meaning, is so sweeping that its sanctions may be applied to conduct which the state is not permitted to regulate. *Bachowski v. Salamone,* 139 Wis. 2d 397, 411, 407 N.W.2d 533 (1987). "The essential vice of an overbroad law is that by sweeping protected activity within its reach it deters citizens from exercising their protected constitutional freedoms, the so-called 'chilling effect.' " *Id.* An overbreadth challenge may be based on hypothetical speculation and does not require the presence of a "chilling effect" in the defendant's particular case. *Milwaukee v. Wilson,* 96 Wis. 2d 11, 19–20, 291 N.W.2d 452 (1980). This court has also held

that where possible we must interpret a statute to avoid constitutional invalidity. *Bachowski,* 139 Wis. 2d at 405.

I conclude that the First Amendment is not implicated in this case. However, in concluding that the challenged statute is constitutional I do not take lightly the First Amendment issue that Mitchell has raised. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989).

I reject the majority's and Mitchell's argument that sec. 939.645, Stats., punishes or has a chilling effect on free speech. The penalty enhancement statute is directed at the action or conduct of selecting a victim and committing a crime against that victim because of his or her protected status. The gravamen of the offense is selection, not the perpetrator's speech, thought, or even motive.[2] The statute does not impede or punish the right

[2]One of the majority's chief contentions seems to be that the statute is unconstitutional because it punishes motive. Although I do not think that this statute punishes motive, even if it did, I have serious doubts about the majority's conclusion that punishing motive is impermissible under the First Amendment. The majority cites no authority to support its conclusion that punishing motive is impermissible under the First Amendment. In fact, the majority fails to explain why, under its analysis, it is impermissible for the penalty enhancer statute to punish a discriminatory motive, yet permissible for antidiscrimination statutes to punish a discriminatory motive. *See, e.g., Rabidue v. Osceola Refining Co.,* 584 F. Supp. 419, 424–425 (1984), *aff'd,* 805 F.2d 611 (6th Cir. 1986), *cert denied,* 481 U.S. 1041 (1987) ("it is merely concluded that the company's pre-discharge conduct toward plaintiff was not based on anti-female animus. Absent such animus, there can be no violation of Title VII"); *E.E.O.C. v. Maxwell Co.,* 726 F.2d 282 (1984). In fact one writer commenting

187

of persons to have thoughts or to express themselves regarding the race, religion, or other status of a person. The statute's concern is with criminal conduct plus purposeful selection. By enhancing the penalty, the penalty enhancer statute punishes more severely criminals who act with what the legislature has determined is a more depraved, antisocial intent: an intent not just to injure but to intentionally pick out and injure a person because of a person's protected status. The legislative concern expressed in this statute is not with the beliefs, motives, or speech of a perpetrator but with his or her action of purposeful selection plus criminal conduct.

Admittedly, the conduct prohibited by the penalty enhancer statute can be proven by an extensive combination of facts that might include words uttered by a

on Title VII is at complete odds with the majority's analysis of motive under the criminal law. He writes:

> Title VII was passed because Congress perceived that actions resulting from bad thoughts were sufficiently pervasive to substantially limit economic opportunities of blacks. 'Bad thoughts' is, of course, shorthand for a wide range of interior activities which are the necessary predicate for disparate treatment liability. A more common terminology is 'prohibited considerations,' but 'bad thoughts' describes more graphically what disparate treatment entails.
>
> . . ..
>
> The notion of bad thoughts is not peculiar to disparate treatment discrimination under Title VII. It has played an important role in the Court's constitutional decisions over the last two decades in contexts ranging from equal protection to freedom of speech and religion. Nor is such concern new in the law. Modern criminal law has always manifested a concern for motivations under the rubric of mens rea. In the discrimination context, however, motivations are both more important and more elusive than in criminal law because the 'conduct' violating Title VII is neutral or positive except when it springs from bad thoughts. In the criminal context, much prohibited conduct is itself suspect. Charles A. Sullivan, Accounting For *Price Waterhouse:* Proving Disparate Treatment Under Title VII, Brooklyn L. Rev. 1107, 1139–1140 (1991).

defendant.[3] However, if words are used to prove the crime, the words uttered are not the subject of the statutory prohibition; rather, they are used only as circumstantial evidence to prove the intentional selection. Permitting the use of such evidence does not chill free speech. Just as words of defendants are frequently used to prove the element of intent in many crimes without violating the First Amendment, words may be used to prove the act of intentional selection. It is no more a chilling of free speech to allow words to prove the act of intentional selection in this "intentional selection" statute than it is to allow a defendant's words that he "hated John Smith and wished he were dead" to prove a defendant intentionally murdered John Smith.

The use of speech under the penalty enhancer is not different than its use in prosecutions under antidis-

---

[3]The majority essentially contends that the use of speech as circumstantial evidence impermissibly chills free speech. Once again the majority fails to explain why this is not also true in antidiscrimination cases. For example, under Title VII sexual harassment jurisprudence, an employee's or employer's sexist speech is not merely evidence of prohibited conduct; it is the prohibited conduct. *See, e.g., Zabkowicz v. West Bend Co.,* 589 F. Supp. 780, 782–83 (E.D. Wis. 1984) (in three-year period, 75 sexually explicit drawings posted on pillars and other conspicuous places in the workplace); *Volk v. Coler,* 845 F.2d 1422, 1426–27 (7th Cir. 1988) (plaintiff alleged, among other things, that her supervisor called her and other female employees 'hon,' 'honey,' 'babe' and 'tiger.') *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3d Cir. 1990) (pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may be sufficient to show a hostile work environment). *See also Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1535 (M.D. Fla. 1991) ("pictures and verbal harassment are not protected speech because they act as discriminatory conduct in the form of a hostile work environment").

crimination laws or fair housing discrimination laws. Antidiscrimination statutes often employ terms similar to those contained in the penalty enhancer. For instance, secs. 118.13, 111.321, 101.225, and 66.395, Stats., all prohibit certain conduct that occurs either "because of" or "on account of" or "on the basis of" a status of another person. Proof of violations of these statutes will often involve proof of words used by the violators. Under these statutes and the penalty enhancer, a particular action or conduct is being punished, and speech may be used to prove the conduct. Under the penalty enhancer statute, speech is simply probative of the element of intentional selection. The use of such evidence does not violate the First Amendment. The action of intentional selection is punished, and the words used by a defendant are merely evidence of an intentional selection.

Although the majority attempts to distinguish this statute and antidiscrimination statutes, its distinction is a distinction without a difference. The majority at 164 states that the penalty enhancer statute is unconstitutional because the statute does not punish only the conduct of intentional selection of a victim "[t]he statute punishes the 'because of' aspect of the defendant's selection, the *reason* the defendant selected the victim . . . ." On pages 176–177, the majority abandons this reasoning when applied to antidiscrimination laws. The majority posits that the distinction between the penalty enhancer statute and antidiscrimination laws is that antidiscrimination laws punish only the discrimination, i.e., the refusal to hire, not the discriminatory motive. The majority forgets a key requirement of antidiscrimination statutes. Antidiscrimination statutes do not prohibit a person from not hiring someone of a protected class, they prohibit a person from not hiring someone of a protected class *because* or *on the basis of* his or her

190

protected class. It is not, as the majority suggests, the failure to hire that is being punished, it is the failure to hire because of status. How can the majority find the penalty enhancer statute unconstitutional because it punishes the "because of" aspect of a selection process, and at the same time conclude that antidiscrimination statutes, which do the same thing, are constitutional? The majority at the least ought to answer this question.

The majority also attempts to explain its very complicated and elaborate distinction between this statute and antidiscrimination laws based on some sort of difference between subjective motivations and objective acts. Although I do not quite understand the majority's use of the terms objective and subjective in the context of this case, I interpret the majority's argument to be that this statute is unconstitutional because it punishes the subjective motivations of the actor, while discrimination statutes involve objective acts of discrimination. This is merely the same distinction without a difference referred to above. Like antidiscrimination statutes, the penalty enhancer statute involves an "objective act"—the criminal conduct, e.g., the battery, etc. Likewise, despite the majority's contentions to the contrary, under the majority's analysis antidiscrimination statutes, because they require that the act be "because of" the protected status of the victim, implicate and punish the subjective motive of the actor. For example, in disparate treatment cases (cases in which the discrimination alleged is overt discrimination as opposed to disparate impact where the practices are fair in form, but discriminatory in operation) a person simply does not violate Title VII for refusing to hire a person of a protected status. The objective act alone does not invoke the provisions of the statute. Rather, the refusal must be "because of" the victim's protected status. Assuming that the majority is correct

that this statute punishes motive, it fails to explain how the enhancer is any different from antidiscrimination laws.

If one assumes that the majority is correct that the penalty enhancer punishes motive there is only one distinction between it and antidiscrimination laws. The only distinction that exists between the penalty enhancer statute and antidiscrimination statutes is that the objective acts that are punished are different in that antidiscrimination laws punish legal conduct plus bad motive and the enhancer punishes criminal conduct plus bad motive. While it is true that this is a distinction, the majority never explains why it is a distinction that matters. Why is it permissible to punish motive when it is accompanied by legal conduct and impermissible to punish motive when it is accompanied by illegal conduct. The majority does not give an answer to this question, it merely concludes that the distinction somehow makes a difference. Saying so, again and again, does not make it so.

Lastly, even assuming that the majority is correct in saying that this statute punishes motive, it has still failed to explain why punishing motive is impermissible. A recent case from the U.S. Supreme Court would seem to indicate that the majority is in error. In *Dawson v. Delaware,* 90–6704, slip. op. at 5 (U.S. Supreme Court March 9, 1992), the United States Supreme Court held that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Although under the facts of *Dawson* the Court concluded that there was a First Amendment violation, its analysis lends considerable support to the conclusion that considering the perpetrator's motivations in deter-

mining the appropriate sentence is permissible. For example, in concluding that evidence that the defendant belonged to the Aryan Brotherhood was impermissibly submitted during the penalty phase of a capital case in violation of the First Amendment, the court stated:

> Even if the Delaware group to which Dawson allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case. For example, the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim. In *Barclay,* on the contrary, the evidence showed that the defendant's membership in the Black Liberation Army, and his consequent desire to start a 'racial war,' were related to the murder of a white hitchhiker. *See* 463 U.S., at 942-944 (plurality opinion). We concluded that it was most proper for the sentencing judge to 'tak[e] into account the. *elements of racial hatred in this murder.'* *Id.,* at 949. In the present case, however, the murder victim was white, as is Dawson; elements of racial hatred were therefore not involved in the killing. *Dawson v. Delaware,* 90-6704, slip. op. at 6-7 (U.S. Supreme Court March 9, 1992) (Emphasis added.)

The U.S. Supreme Court is clearly indicating that when racial hatred is relevant to the crime, i.e., the racial hatred is the perpetrator's reason for committing the crime, this information is completely relevant in sentencing. How then can the majority suggest that punishing motive is impermissible?

I repeat. Section 939.645, Stats., is not concerned with speech or thought. It is concerned with intentional selection. It becomes operative not just when a person's speech evinces the discriminatory selection, but rather anytime the choice of a victim from a protected class is

shown to be selective rather than random, discriminating rather than indiscriminate, or designed rather than happenstance.

The penalty enhancer statute also does not seek to punish the motive of a perpetrator. Neither a perpetrator's bigoted beliefs, nor his or her motivation for intentionally selecting a victim because of a protected status are punished. Again, it is the act of selecting a victim because of his or her race, color, or etc., that is proscribed. If a perpetrator seeks out a Jewish person to physically assault, his intent is not just to injure, but to injure a Jewish person. He may be motivated by a hatred of Jewish people, a calling from God to sacrifice a Jewish person, or some other irrational motive. This law does not look to motive. This law does not look at why the perpetrator sought out a Jewish person. It looks only to whether the fact that the victim was Jewish was a substantial factor in the defendant's purposeful choice of the victim.

Similarly, under the facts of the present case, even if Mitchell could show that his motive was not a hatred of whites, his conduct would still be punishable under the statute. As the State points out, Mitchell's motive could have been to impress the group of boys that accompanied him. Nevertheless, the statute would still apply. Its focus is not on bigoted or hateful motivations. Rather, it punishes the action of intentionally selecting a victim on the basis of a protected status listed in the statute. As Mitchell himself emphasized at oral arguments, the term "hate crimes" statute is a misnomer. The crimes that fall under the statute may be motivated by many emotions; the intentional selection is what is prohibited. The statute looks at intent, and statutes are used in many ways to punish crimes differently based on the perceived seriousness of the intent of the perpetrator. For example, an

intent to kill is punished greater than an intent showing utter disregard for human life. Likewise, a reckless intent is punished less than an intent showing utter disregard for human life.

Section 939.645, Stats., does not attempt to prohibit or punish bigotry, antisemitism, or the like. It does attempt to limit their effects. An individual's freedom to express his or her views in writing, speech, or otherwise is not regulated or chilled by this statute. What is prohibited is the act of intentionally selecting victims because of their protected status. Why a Black or a Jewish person or any other person of a protected class was chosen as the victim is not relevant. What is relevant is that the victim is intentionally chosen because of the victim's protected status.

I conclude that sec. 939.645, Stats., legitimately regulates criminal conduct, and raises no issue under the First Amendment. It does not punish speech, thought, or even motivation, nor does it sweep within its ambit actions which are constitutionally protected as to render it unconstitutionally overbroad.

## II.

It is necessary to discuss the vagueness and equal protection issues, even though they are not reached by the majority. These issues are raised by Mitchell. I therefore take this opportunity to address each issue.

Mitchell asserts that this legislative attempt to alleviate bias related crime is unconstitutionally vague. Specifically he contends that the phrases "intentionally selects," "because of," and "race," are vague, undefined, and ambiguous. Thus, he argues that, they lead to erratic convictions and unfair prosecutions. I disagree.

A statute is "unconstitutionally vague if it fails to afford proper notice of the conduct it seeks to proscribe or if it encourages arbitrary and erratic arrests and convictions." *Milwaukee v. Wilson,* 96 Wis. 2d at 16 (footnote omitted). This court has repeatedly indicated that "[t]he principles underlying the void for vagueness doctrine . . . stem from concepts of procedural due process." *State v. Popanz,* 112 Wis. 2d 166, 172, 332 N.W.2d 750 (1983).

To determine whether a statute survives a vagueness challenge, this court has applied a two-part analysis. First, the statute must be sufficiently definite to give persons of ordinary intelligence who wish to abide by the law adequate notice of the proscribed conduct. Second, the statute must provide adequate standards for those who enforce the laws and adjudicate guilt. *See State v. McManus,* 152 Wis. 2d 113, 135, 447 N.W.2d 654 (1989) (citing *City of Oak Creek v. King,* 148 Wis. 2d 532, 546, 436 N.W.2d 285 (1989)). "However, a statute need not define with absolute clarity and precision what is and what is not unlawful conduct." *State v. Hurd,* 135 Wis. 2d 266, 272, 400 N.W.2d 42 (Ct. App. 1986). Furthermore, to survive a vagueness challenge it is not necessary, "for a law to attain the precision of mathematics or science . . .." *Milwaukee v. Wilson,* 96 Wis. 2d at 16. This court has summarized its analysis under a vagueness challenge as follows:

> Thus it is not sufficient to void a criminal statute or regulation to show merely that the boundaries of the area of proscribed conduct are somewhat hazy, that what is clearly lawful shades into what is clearly unlawful by degree, or that there may exist particular instances of conduct the legal or illegal nature of which may not be ascertainable with ease. Before a statute or rule may be invalidated for vagueness,

196

there must appear some ambiguity or uncertainty in the gross outlines of the duty imposed or conduct prohibited such that one bent on obedience may not discern when the region of proscribed conduct is neared, or such that the trier of fact in ascertaining guilt or innocence is relegated to creating and applying its own standards of culpability rather than applying standards prescribed in the statute or rule. *State v. Courtney,* 74 Wis. 2d 705, 711, 247 N.W.2d 714 (1976).

Mitchell's first contention is that the failure of the statute to define the phrase "intentionally selects" renders the statute unconstitutionally vague because it is not a term easily understood by ordinary persons who wish to abide by the law, and fails to provide adequate standards for enforcers of its provisions. I disagree. I conclude that the phrase "intentionally selects" is sufficiently definite to provide notice of prohibited conduct to persons of ordinary intelligence who wish to abide by the law and adequate standards for those who enforce the laws and adjudicate guilt.

The word "intentionally" is a word that is easily understood. "Intentionally" means a purpose to do the thing or cause the result specified. Lay persons of ordinary intelligence do not need to scurry to their dictionaries in order to understand the meaning of this well recognized and easily understood word.

Nor is this a word that is a stranger to law enforcement officials, judges, and juries. "Intentionally" is defined in the criminal code at sec. 939.23(3), Stats.:

'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result. In addition, except as provided in sub. (6), the actor must have knowledge of those facts

197

which are necessary to make his or her conduct criminal and which are set forth after the word 'intentionally'.

The Wisconsin statutes, particularly criminal statutes, are replete with references to "intentional" acts, or acts or conduct done "intentionally." *See, e.g.,* sec. 939.051(b), Stats. (whoever intentionally aids and abets the commission of a crime may be charged as a principal); sec. 939.48 (person is privileged to threaten or intentionally use force against another for the purpose of self defense); sec. 940.07 ("[w]hoever knowing the vicious propensities of any animal intentionally allows it to go at large . . ..."); *see also* secs. 7.37(5), 19.58, 12.13, 26.05(3)(b), 26.14(8) and 20.927(4). Unquestionably, law enforcement officials, judges, and juries are quite capable of applying the word to varied situations in the resolution of a legal case.

Likewise, the word "selects" is well understood and easily defined. "Select" means "to choose from a number or group . . . by fitness, excellence, or other distinguishing feature . . .." Webster's Third New International Dictionary 2058 (1961). As the court of appeals concluded, the meaning of the phrase "intentionally selects" is easily discerned. It means to purposely choose or pick out. I conclude that the phrase "intentionally selects" is sufficiently clear to persons of ordinary intelligence to afford a practical guide for law-abiding behavior and is capable of application by those responsible for enforcing the law.

In the court of appeals, Mitchell appeared to make an alternative vagueness argument with respect to the phrase "intentionally selects." The court of appeals explained his argument as follows:

Assuming that 'intentionally selects' means to pur-
posely pick out, Mitchell apparently argues that the
term is still ambiguous as applied. If we understand
Mitchell's argument correctly, the underlying ratio-
nale for Mitchell's attention to the term 'intention-
ally selects' is this: Any time an accused is a different
race than the alleged victim, it can be viewed as a
'hate crime' suitable for use of the penalty enhancer
since there is no way to discern whether the victim
was picked out because of race or because of other
reasons. Under the statute, the very fact that this
particular victim *was* picked out indicates that the
victim was 'intentionally selected.' Therefore, Mitch-
ell argues that so long as the accused 'knows' the
victim is of a different race, a different color or a
different religion, the accused will be subject to the
statute. This, he claims, allows its use by prosecutors
and police without any guidelines. *State v. Mitchell,*
163 Wis. 2d 652, 661-62, 473 N.W.2d 1 (Ct. App.
1991).

Although Mitchell does not appear to have abandoned
this argument, he seems to have framed it in slightly
different terms. Mitchell now appears to argue that the
statute is vague because it does not indicate to what
extent a victim's protected status must affect the perpe-
trator's selection decision in order to implicate the stat-
ute. In other words, he argues that because the meaning
of the phrase "because of" is vague and not ascertainable
by an ordinary person, a fair application of the statute is
impossible, and it will likely be applied any time an
accused is a different race than the victim. I do not
agree.

I agree with the court of appeals that the operative
terms in the statute are not whether the victim is of a
different "color" or "race," or other protected status.
Rather, the operative terms are whether the victim was

"intentionally selected" or purposely picked out "because of" the victims race, color, etc. "If a victim is of a different race . . . than the perpetrator, that fact alone will not allow the penalty enhancer to be used." *Mitchell,* 163 Wis. 2d at 662. What is important is whether the perpetrator picked out the victim because of his or her race. The key is the "intentional selection because of" the victims protected status.

I reject Mitchell's contention that the language "intentionally selects because of" fails to define with sufficient specificity the conduct which is proscribed. I again emphasize that " '[T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices . . ..' " *Bachowski,* 139 Wis. 2d at 410. (citing *Roth v. United States,* 354 U.S. 476, 491 (1957)). Giving the phrase "because of" its ordinary commonsense meaning, *see State v. Whittrock,* 119 Wis. 2d 664, 670, 350 N.W.2d 647, measured by common understandings and practices, I conclude that where a victim's protected status is a substantial factor in the perpetrator's selection decision, the enhancement statute applies.

It is unreasonable to construe "because of" to mean that the statute applies where race, color, or the like is only a minor or de minimis factor in the perpetrator's selection decision. Such a construction in light of the legislature's rationale (see Section III below) would be absurd. Nor would it be reasonable to construe the phrase to mean that the statute applies only when race, color, or the like is the sole factor in the perpetrator's selection decision. Legislatures realize that seldom, if ever, do people act based on one factor or consideration. Rather, people's conduct is largely driven by a multitude

200

of factors which have varying impacts on their decisions. A reasonable reading of the statute is that it creates liability where "but for" the victim's protected status, the perpetrator would not have selected the victim for the crime. Thus, I conclude the victim's status must be a substantial factor in the selection decision to the extent that in the absence of that status the perpetrator would not have selected the victim.

I therefore conclude that the legislature's use of the words "because of," in sec. 939.645, Stats., although perhaps not as precisely drafted as possible, conveys "sufficiently definite warning as to the proscribed conduct" to withstand a vagueness challenge. Furthermore, Mitchell's conduct plainly falls within the prohibited zone of the statute, as there is no doubt that Gregory Reddick's race was a substantial factor in Mitchell's selection of him as his victim.[4]

Mitchell also contends that the word "race" is vague and ambiguous. I agree with the State that it is difficult to determine the basis of defendant's argument in this regard. I construe Mitchell's argument, as did the court

[4]The defendant has waived any challenge he might have had to the propriety of the jury instruction given in this case. However, even if it were not waived, the defendant would be hard pressed to show that the instruction given in this case caused him harm. The instruction in this case indicated that in order for the jury to conclude that the defendant intentionally selected the victim because of his race they must conclude "that the defendant knew that Gregory Reddick was a member of the white race and committed the crime of aggravated battery against him for the reason that he was a member of that race." While this instruction may have given the jury the impression that the victim's race had to be the sole factor in the defendant's selection decision, it certainly did not give the impression that a finding that race was anything less than a substantial factor would trigger the penalty enhancer statute.

of appeals, to be that persons of ordinary intelligence do not know the difference between the terms "race" and "color." This argument has no merit.

I find it difficult to believe that persons of ordinary intelligence would not understand what the word "race" means. Furthermore, even if there were difficulty understanding the literal difference in the terms "race" and "color," both are terms covered in the statute. Selection because of race or color is prohibited by the statute. Therefore, if people of ordinary intelligence understand the general parameters of either term, they have fair notice of the conduct that is prohibited.

Mitchell also suggests that the statute is unconstitutional because law enforcement authorities, judges, and juries may or may not pursue penalty enhancement under the statute based on their own prejudices or views toward the race, or religion, etc., of the victim or the defendant. I understand Mitchell's argument to be a constitutional challenge based on vagueness, i.e., because the statute is vague, law enforcement officials will use their own prejudices to apply the statute. This argument is meritless.

As I concluded above, the statute is sufficiently clear to persons of ordinary intelligence to provide adequate standards for those who enforce the laws, such that they will not be relegated to creating their own standards. The law enforcement responsibility to determine whether the conduct proscribed by the penalty enhancement statute can be proven in a particular case is no more difficult than similar determinations routinely made by officials in enforcing the law. Furthermore, the potential for improper jury bias and prosecutorial abuses is present in many cases. Safeguards exist to protect against these abuses. For example, this court has reviewed prosecutorial charging decisions to determine if

there has been an abuse of discretion or discriminatory prosecution. *See State v. Karpinski*, 92 Wis. 2d 599, 609, 285 N.W.2d 729 (1979). This court has held that a prosecutor's decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. *Sears v. State*, 94 Wis. 2d 128, 134, 287 N.W.2d 785 (1980). Thus, discriminatory abuses can be dealt with through other law; its potential does not render a statute vague.

The last contention made by Mitchell concerning vagueness is that the statute does not provide standards to help law enforcement determine what evidence can be used to prove a violation of the statute. A statute does not have to dictate rules in regard to admissibility of evidence. Just as in any other case, the Wisconsin Rules of Evidence provide a comprehensive guide for law enforcement. Hypothetical speculation as to how far back into a person's life a prosecutor can delve to prove the prohibited conduct of intentional selection does not render the statute unconstitutional. The rules of evidence which deal with relevancy provide adequate standards to guide law enforcement in determining the appropriate nexus between evidence and alleged misconduct, such that the evidence is admissible. *See* Wisconsin Rules of Evidence 904.01, 904.02, and 904.03.

I conclude that the legislature has defined the conduct proscribed by sec. 939.645, Stats., with sufficient specificity to meet constitutional requirements with respect to vagueness. The law is clear in its terms and its meaning. When the victim's protected status (i.e., race, religion, etc.) is a substantial factor in the defendant's purposeful choice of a victim, the statute becomes operative.

203

### III.

Lastly, I discuss Mitchell's equal protection challenge. In *McManus,* 152 Wis. 2d at 130–31, this court summarized the law with respect to equal protection:

> Equal protection . . . requires that there exist a reasonable and practical grounds [sic] for the classifications drawn by the legislature. . . . Equal protection does not deny a state the power to treat persons within its jurisdiction differently; rather, the state retains broad discretion to create classifications so long as the classifications have a reasonable basis. The fact a statutory classification results in some inequity, however, does not provide sufficient grounds for invalidating a legislative enactment. (Citations omitted.)[5]

If the statute in question does not impinge on a fundamental right or create a classification based on a suspect criterion, the legislative enactment " 'must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest.' " *Id.*

---

[5]The Equal Protection Clause of the United States Constitution provides:

No state shall . . . deny to any person within its jurisdiction the equal protection of the laws. Amendment XIV, Section 1, United States Constitution.

The Equal Protection Clause of the Wisconsin Constitution Provides:

All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness. . . . Article I, Section 1, Wisconsin Constitution.

This court has held that the equal protection clause of the Wisconsin Constitution is the substantial equivalent of its respective clause in the federal constitution. *See State ex rel. Cresci v. H&SS Department,* 62 Wis. 2d 400, 414, 215 N.W.2d 361 (1974).

(citation omitted). "If the classification is reasonable and practical in relation to the objective, that is sufficient and doubts must be resolved in favor of the reasonableness of the classification." *State v. Jackman*, 60 Wis. 2d 700, 705–06, 211 N.W.2d 480 (1973). I examine sec. 939.645, Stats., under a rational basis test. The present case does not impinge on a fundamental right or create a classification based on a suspect criterion.

Section 939.645, Stats., is violated when the victim's protected status is a substantial factor in the defendant's purposeful choice of a victim for certain crimes. When such intentional selection on account of status is proved, penalties in addition to the underlying crime are assessed. I perceive this legislation to be a legislative judgment that crimes involving intentional selection of a victim because of the victim's status cause greater harm to victims and to the public than do crimes in which status is not a factor. Because of this, the legislature has chosen to punish these intentional selection crimes more severely than conviction of the underlying crime would otherwise require.

Regulation of harmful conduct is a legitimate exercise of a state's power. The function of the legislature in drafting criminal laws is always to make reasoned decisions concerning the social harm of particular conduct. The criminal laws are replete with similar legislative judgments involving enhanced penalties. For example, sec. 939.63, Stats., increases the penalty for a crime if the person possesses, uses, or threatens to use a dangerous weapon. Similarly, if a person commits a crime while his or her identity is concealed, the penalty for the underlying crime may be increased under sec. 939.641. *See also,* sec. 939.62 (increased penalty for habitual criminality); sec. 939.621 (increased penalty for certain domestic abuse offenses); sec. 939.64 (increased penalty

for committing a felony while wearing a bullet-proof garment); sec. 948.02 (sexual contact or sexual intercourse with a person who has not attained the age of 13 years is guilty of Class B felony, while sexual contact or intercourse with a person who has not attained the age of 16 is a Class C felony); sec. 940.31 (kidnapping, a Class B felony under the statute is enhanced to a Class A felony when it is committed with the intent "to cause another to transfer property in order to obtain the release of the victim").

There is ample evidence to support the legislature's conclusion that intentional selection of a victim from a protected class causes a greater harm to its victims as well as to society than do crimes where the victim's status is not a factor. Many commentators have discussed the widespread psychological harms caused by crimes that appear to be bias related. *See generally,* Delgado, Words that Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling, 17 Harv. C.R.–C.L. L. Rev. 133 (1982); Matsuda, Public Response to Racist Speech: Considering the Victim's Story, 87 Mich. L. Rev. 2320 (1989); Developments in the Law Sexual Orientation and the Law, 102 Harvard L. Rev. 1508, 1541 (1989). These theorists posit that bias related crimes cause injury and damage far beyond that created by similar criminal conduct which does not appear to be bias related because of their tendency to perpetuate prejudice and victimize classes of people. *See generally,* Gellman, supra at 340. Crimes that appear to be based on intentional selection because of the victim's status create fear not only among those who share the victim's race, color, religion, etc; but they also threaten society in general. Reports of intentional selection, even if perhaps not motivated by bigotry, create the appearance of bigotry and hatred. These crimes breed fear, misunderstanding,

misconceptions, and isolation between different classes of people. The Wisconsin legislature has attempted to hinder these crimes, not by regulating speech, thought, or even motivation, but rather by enhancing the criminal penalty for any crime, however motivated, where the perpetrator purposefully selects a victim because of a protected status. I conclude that the legislature's action was eminently reasonable and does not violate principles of equal protection.

Mitchell posits an additional equal protection challenge to sec. 939.645, Stats. Mitchell argues that because sec. 939.645 applies only to crimes listed in the Criminal Code, chs. 939–948, and not to other crimes found in the Wisconsin statutes, it violates equal protection. Mitchell contends that this differentiation creates a classification based on suspect criterion which violates equal protection for three reasons: (1) the statute discriminates against the poor and uneducated because they are most frequently accused of the crimes listed in chs. 939–948, and in contrast "white collar" criminals are exempt from the penalty enhancement because they commit the crimes found outside these chapters; (2) treating crimes proscribed under chs. 939–948 differently from other crimes is unreasonable because some crimes found outside chs. 939–948 are more serious than those found in chs. 939–948; (3) it is unreasonable to exclude certain crimes, such as illegal restraints of trade, hunting violations, motor vehicle violations, consumer fraud, drugs and narcotics, etc., found outside chs. 939–948 from the penalty enhancement provision. Mitchell's arguments are without merit.

Section 939.645, Stats., singles out no particular group for different treatment, and thus no suspect classification is involved. As the State points out, there simply is no "white collar/poor people" distinction found in sec.

939.645. Mitchell has offered no evidence to support his theory that poor or minorities are the groups usually accused of committing crimes under chs. 939–948. Furthermore, several crimes listed in the Criminal Code involve what are traditionally viewed as "white collar" crimes. *See, e.g.,* sec. 943.70, (theft of trade secrets); sec. 943.38 (forgery); sec. 943.70 (computer crimes); and sec. 946.12 (misconduct in public office). Likewise, crimes that are not traditionally viewed as "white collar" crimes are found outside chs. 939–948. *See, e.g.,* ch. 161 which covers drug offenses. The dichotomy which Mitchell seeks to establish does not exist and his argument is without merit.

Mitchell's second argument is also without merit. Mitchell contends that the classification is not proper because some crimes found outside chs. 939–948, Stats., are more serious than crimes in the Criminal Code. Even if, as Mitchell suggests, some crimes outside chs. 939–948 pose more serious harms, equal protection does not require legislatures to order "evils hierarchically according to their magnitude and to legislate against the greater before the lesser." *U.S. v. Holland,* 810 F.2d 1215, 1219 (D.C. Cir. 1987), *cert denied,* 481 U.S. 1057 (1987).

Lastly, Mitchell claims it is irrational to exclude certain crimes from the penalty enhancer statute. Mitchell points to crimes such as hunting violations and motor vehicle violations and argues that these crimes may be committed against specially selected victims just as those covered by the enhancer. However, as the State notes, this assertion is also meritless because although the harm is undeniable when victims are singled out for non-criminal code crimes, the legislature is not required to legislate against all harms. *See McDonald v. Board of*

*Election,* 394 U.S. 802, 809 (1969). Therefore no equal protection violation exists.

The State offers two further explanations for why the legislature chose to apply sec. 939.645, Stats., only to crimes grouped in the criminal code chs. 939–948. First, the crimes which are most likely to involve bias related victim selection are listed in the Criminal Code. For example, battery, homicide, and criminal damage to property are listed in the Criminal Code. Second, by limiting application of the penalty enhancer to the Criminal Code, the legislature was able to quickly identify with certainty the majority of offenses which are most appropriate for penalty enhancement. The limiting application "avoided the cumbersome task of examining the multitude of crimes found outside the criminal code for possible unanticipated and undesired results." I find these explanations rational and practical in light of the purpose behind sec. 939.645 of preventing and deterring bias related crime.

## IV.

In conclusion, no one disagrees with the majority's statement that "punishment of one's thought, however repugnant the thought, is unconstitutional." The majority misses the point entirely. Of course the Constitution protects bigoted and hateful thoughts, but it does not lend its protection to the person who harbors such thoughts and then *acts* on them. *See, e.g., Roberts v. United States Jaycees,* 468 U.S. 609, 628 (1984) ("acts of invidious discrimination in the distribution of publicly available goods, [and] services . . . like violence or other types of potentially expressive activities that produce special harms distinct from their communicative impact, . . . are entitled to no constitutional protection"); *Hishon*

*v. King & Spalding,* 467 U.S. 69, 78 (1984) (" '[i]nvidious
. . . discrimination . . . has never been accorded affirma-
tive constitutional protections.' . . . There is no constitu-
tional right, for example, to discriminate in the selection
of who may attend a private school or join a labor
union."); *Runyon v. McCrary,* 427 U.S. 160, 176 (1976)
(" 'the constitution places no value on discrimination',
. . . and while '[i]nvidious private discrimination may be
characterized as . . . protected by the First Amendment
. . . it has never been accorded affirmative constitutional
protections' "). Is it the majority's conclusion that it is
permissible to act on bigoted beliefs?

   I conclude that the penalty enhancer statute is
neither vague nor overbroad. I further conclude that the
statute does not violate principles of equal protection.
Accordingly, I dissent.