STATE of Wisconsin, Plaintiff-Appellant-Cross Respondent,

v.

Marvin C. THIEL, Defendant-Respondent-Cross Appellant.

Supreme Court

*No. 92–0794–CR. Oral argument October 12, 1993.—Decided May 13, 1994.*

(Also reported in 515 N.W.2d 847.)

506

507

For the plaintiff-appellant-cross respondent the cause was argued by *Daniel J. O'Brien,* assistant attorney general, with whom on the briefs (in the court of appeals) was *James E. Doyle,* attorney general.

For the defendant-respondent-cross appellant there were briefs (in the court of appeals) by *Richard Hahn* and *Holden & Hahn, S.C.,* Sheboygan and oral argument by *Richard Hahn.*

JANINE P. GESKE, J. This case is before the court on certification by the court of appeals, pursuant to sec. (Rule) 809.61, Stats. The state appeals from a March 26, 1992, order of the circuit court for Sheboygan County, Gary Langhoff, Circuit Judge, suppressing inculpatory statements given to the police by the defendant, Marvin Thiel (Thiel), who was charged with feloniously exhibiting to a child material which is harmful to children and with feloniously attempting to exhibit harmful material to a child. Thiel cross-appeals from that part of the March 26 order which denied his motions regarding deficiencies in the preliminary hearing and in the charging decision; lack of probable cause in the affidavit supporting the request for a search warrant; overbreadth of the search warrant; and the involuntariness of his statements

given to police. Thiel also appeals from a November 19, 1991, order wherein Judge Langhoff denied his motion to dismiss the criminal complaint on grounds of lack of probable cause and the constitutionality of sec. 948.11, Stats.

The questions certified by the court of appeals are as follows:

(1) Was Thiel's inquiry of the police—"Do you think I need an attorney?"—sufficient to invoke his right to counsel?

Consistent with our holding in *State v. Walkowiak*, 183 Wis. 2d 478, 480, 486, 515 N.W.2d 863 (1994), also mandated today, we conclude that such a statement is equivocal and, therefore, insufficient to invoke the right to counsel. Further, we hold that upon an equivocal inquiry, all interrogation must cease until the ambiguity is resolved.

(2) Is sec. 948.11, Stats., which regulates the dissemination of obscene materials "harmful to children," unconstitutional due to overbreadth?

We hold that sec. 948.11, Stats., is not unconstitutionally overbroad. Rather, the legislature has properly adapted the *Miller* obscenity test[1] in order to assess what materials are harmful to minors so as to protect the well-being of youth without unduly burdening the first amendment rights of adults to view, sell or examine materials not considered obscene for them. Nor are the first amendment rights of adults unduly burdened by incorporating the term "exhibit" in the statute. In sec. 948.11(2)(a) and (b), we construe the term "exhibit" to mean "to offer or present for inspection." This definition is in harmony with the statutory

---

[1] *Miller v. California*, 413 U.S. 15 (1973).

focus upon the affirmative conduct of an individual toward a specific minor or minors.

Additionally, this court heard arguments on several issues not certified by the court of appeals. First, Thiel argues that the statutory exemption provided for libraries and educational institutions in sec. 948.11(4), Stats., violates his right to equal protection guaranteed by the fourteenth amendment to the United States Constitution and art. I, sec. 1 of the Wisconsin Constitution, thereby requiring strict scrutiny. We disagree and hold that sec. 948.11 is a constitutional variable obscenity statute. We conclude that the library and educational institution exception is reasonable and rationally related to the fundamental purpose of the legislation.

Second, Thiel challenges the sufficiency of the facts in the amended complaint and evidence presented at the preliminary hearing to support the charge of attempt to exhibit harmful materials to a child. We disagree and conclude that the facts in the amended complaint as well as evidence presented at the preliminary hearing established probable cause that Thiel committed the crime of attempt to exhibit harmful materials to a minor, in violation of secs. 948.11(2)(a) and 939.32(1), Stats.

Finally, Thiel argues that the search warrant was not supported by probable cause and was not reasonably specific so as to survive fourth amendment scrutiny. We disagree. The magistrate in this case properly applied the "totality of the circumstances" test enunciated in *Illinois v. Gates,* 462 U.S. 213, 230 (1983), to determine that a fair probability existed that evidence of a crime would be found at the Thiel residence and place of business. Additionally, given the nature of the activity under investigation and the age

511

of the alleged victim, the search warrant was reasonably specific to satisfy fourth amendment scrutiny.

For purposes of this appeal, we rely on the facts alleged in the complaint and testified to at the preliminary hearing and the suppression hearing. On October 15, 1991, Thiel was served with a criminal complaint alleging one count of feloniously exhibiting harmful materials to a child, in violation of sec. 948.11(2)(a), Stats.,[2] and one count of feloniously attempting to exhibit harmful materials to a child, in violation of secs. 948.11(2)(a) and 939.32(1), Stats.[3] These charges were the result of an incident which occurred on August 26, 1991. On that day, J.L.L., a 10-year-old girl, entered Thiel's place of business, C&M Specialty Sales, in Sheboygan, Wisconsin. The store is known by patrons as a hobby shop or art supply store—a place frequented by children in order to purchase candy, pencils, and other miscellaneous items. J.L.L. had been to this store on other occasions and knew the proprietor as a man named "Marv."

On August 29, 1991, J.L.L. gave Sheboygan police an account of what happened to her in Thiel's store three days earlier. J.L.L. stopped by the store with her younger sister to see what items she could afford to buy. From behind the store counter, Thiel answered

[2] Section 948.11(2)(a), Stats., provides as follows:

> **(2)** Criminal penalties. (a) Whoever, with knowledge of the nature of the material, sells, exhibits, transfers or loans to a child any material which is harmful to children, with or without monetary consideration, is guilty of a Class E felony.

[3] Section 939.32(1), Stats., provides in relevant part as follows:

> **939.32 Attempt. (1).** Whoever attempts to commit a felony . . . may be fined or imprisoned or both not to exceed one-half the maximum penalty for the completed crime . . ..

questions about merchandise prices. Thiel and J.L.L. then had a conversation about birthdays, particularly the upcoming birthday of J.L.L. It was during this conversation that J.L.L. saw Thiel take a booklet from his desk drawer. Thiel then showed J.L.L. the photographs in the booklet, photographs of "people with no clothes on," and stated to her that the people in the pictures were involved in "S–E–X." In one of the pictures, J.L.L. saw a man on top of a woman, and "Marv" told her the man was putting something inside the woman so the woman could have a baby.

After showing her the photographs, "Marv" asked her if he should go warm up the VCR in the back room so the two of them could watch "dirty movies." The back room Thiel referred to was part of his residence, which was attached to the store. J.L.L. became worried and uncomfortable as a result of Thiel's comments, and she told him she and her sister had to leave because their mother was calling.

Further discussions about the incident occurred between J.L.L. and two Sheboygan police detectives, who were granted a search warrant for the business and residence of Marvin Thiel. In their search of the premises, the detectives seized videotapes, a VCR, a video camera, various sex toys, and one cartoon depicting Bart Simpson engaging in fellatio with a small child.[4] The police also seized a booklet entitled "Sexual Secrets of the Zodiac," which was recovered from the right top drawer of the store's desk. The booklet contained photographs consistent with the description given by J.L.L.

While executing the search warrant, the detectives made contact with Thiel. He was informed of the

---

[4] Bart Simpson is a preadolescent TV cartoon character.

nature of the warrant as well as his *Miranda* rights.[5] Thiel indicated he was willing to talk with the officers and signed a waiver form, acknowledging his understanding of those rights. He then showed the police where they could find his X-rated movies. He denied being in possession of photos depicting sexual activity or showing any sexually explicit photos to children. Following the search, Thiel was taken to the Sheboygan Police Department, where he was once again informed of his *Miranda* rights, and, for a second time, Thiel signed the waiver form. When asked by the interrogating officer if he understood the import of the *Miranda* warnings, Thiel said, "Do you think I need a lawyer?" The detective responded, "That's up to you." After a momentary pause, Thiel signed the form.

During the subsequent interrogation, Thiel initially denied any knowledge of the incident with J.L.L. However, he later admitted showing her the "Sexual Secrets of the Zodiac" booklet only after J.L.L. started a conversation with him about sexual activity.[6] After telling police that he did offer to take J.L.L. into his residence to show her videos, Thiel further stated that he has had a problem with an attraction to children for the past six years.

A criminal complaint was filed against Thiel on September 18, 1991, which charged him with exhibiting harmful materials to a minor, in violation of sec. 948.11(2)(a), Stats., and attempted child enticement, in violation of sec. 948.07(5), Stats. An amended com-

---

[5] *Miranda v. Arizona,* 384 U.S. 436 (1966).

[6] Thiel claimed that J.L.L. told him she had seen X-rated movies in her home, without her parents' knowledge. He used the booklet "Sexual Secrets of the Zodiac" to look up J.L.L.'s date of birth in order to identify the sexual activities of her astrological sign.

plaint was filed October 15, 1991, which modified Count 2 in order to delete the allegation of attempted child enticement. The initial charge was replaced with attempt to exhibit harmful material to a minor, in violation of secs. 948.11(2)(a) and 939.32(1), Stats.

Thiel challenged both counts of the amended complaint for the following reasons: (1) sec. 948.11, Stats., was unconstitutionally overbroad; (2) the complaint did not establish probable cause; (3) there was insufficient evidence to establish attempt; and (4) sec. 948.11(1), (2), and (4), Stats., violated his right to equal protection of the laws. At Thiel's preliminary hearing, the court denied his motion to dismiss the complaint. At the conclusion of that hearing, the court found probable cause to believe that a felony was committed by Thiel, ordering his bindover for trial. The circuit court denied Thiel's motion to stay court proceedings, which resulted in the submission of additional pretrial motions, including: (1) a challenge to the sufficiency of the affidavit in support of the search warrant; (2) a challenge to the sufficiency of the evidence presented at the preliminary hearing regarding Count 2 of the complaint; and (3) a challenge to the interrogation by the Sheboygan police, which yielded inculpatory statements violative of *Miranda*. Though the court denied the other pretrial motions, it did grant a motion to suppress certain inculpatory statements, from which the state now appeals.[7]

---

[7] The state, in its brief, notes that the circuit court granted the motion to suppress inculpatory statements made by Thiel to the Sheboygan police regarding his attraction to children and that he showed photos depicting nudity to J.L.L. and asked her to watch "dirty movies" with him. The circuit court granted the motion to suppress because it believed the officer did not go far

## THE REQUEST FOR COUNSEL

■

The state challenges the suppression by the circuit court of a series of inculpatory statements Thiel made to the Sheboygan police on September 17, 1992. In deciding whether the police violated Thiel's fifth amendment privilege against self-incrimination, we conduct an independent review of this question of constitutional fact. *State v. Kramar,* 149 Wis. 2d 767, 784, 440 N.W.2d 317 (1989) (citing *State v. Turner,* 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987)).

During the execution of the search warrant at Thiel's home and place of business, Sheboygan police informed Thiel of his rights under *Miranda,* 384 U.S. 436. Indicating that he was willing to cooperate with the police, Thiel signed a form which waived his right to counsel and to be silent. At the conclusion of the search, police asked Thiel to accompany them to the police station. Once there, Thiel was again informed of his *Miranda* rights. Thiel then asked one of the detectives, "Do you think I need an attorney?" and the detective responded, "That's up to you." According to the detective, Thiel paused momentarily and then, for a second time, signed a waiver form. During the subsequent interrogation, Thiel made a series of statements to the police, including an admission that he showed J.L.L. "Sexual Secrets of the Zodiac" and that he had had an attraction to children for the past six years.

At a motion hearing in January, 1992, Thiel argued that the statements he made while at the police station should be suppressed. Suppression was warranted, according to Thiel, because he invoked his right

---

enough to clarify what it viewed to be an ambiguous request by Thiel for counsel.

to counsel when he asked the police, "Do you think I need an attorney?" Therefore, any admissions made as a result of subsequent interrogation were in violation of his rights, since the police failed to ascertain whether the inquiry was in fact a request for counsel. The police did not coerce Thiel to get him to either sign the waiver form or to make the inculpatory statements. Additionally, no further interrogation commenced until after Thiel signed the waiver form.

The facts of this case may be easily distinguished from the situation in *State v. Lampe,* 119 Wis. 2d 206, 349 N.W.2d 677 (1984), in which the defendant clearly made a request for counsel prior to additional interrogation. At no time during the search of Thiel's residence or store, nor later at the Sheboygan police station, did Thiel request the assistance of counsel. At no time was Thiel coerced to sign either of the waiver forms or to make subsequent inculpatory statements to the police. Rather, he was informed on two separate occasions of his rights and unequivocally waived those rights by signing the forms. In *Walkowiak,* we held that when a defendant makes an equivocal inquiry regarding the presence of counsel, all interrogation must cease until the ambiguity is resolved. The police officer's response, "That's up to you," as well as Thiel's conduct in resigning the waiver form following his equivocal inquiry, "Do you think I need an attorney?" resolved any ambiguity which may have existed. We now reverse the order of the circuit court which suppressed inculpatory statements made by Thiel. We also note here that distinct from the situation in *Walkowiak,* the issue of whether the waiver by Thiel was voluntary, intelligent and knowing was resolved at the circuit court level. The court found beyond a rea-

517

sonable doubt that statements made to the police were the result of a rational decision by Thiel and uncoerced.

## OVERBREADTH CHALLENGE

Thiel raises a facial constitutional challenge to sec. 948.11, Stats.,[8] which makes it a crime to exhibit harmful materials to minors. Thiel contends that this

---

[8] The complete text of sec. 948.11, Stats., is as follows:

**948.11 Exposing a child to harmful material. (1)** Definitions. In this section:

(a) 'Harmful material' means:

1. Any picture, photograph, drawing, sculpture, motion picture film or similar visual representation or image of a person or portion of the human body that depicts nudity, sexually explicit conduct, sadomasochistic abuse, physical torture or brutality and that is harmful to children; or

2. Any book, pamphlet, magazine, printed matter however reproduced or sound recording that contains any matter enumerated in subd. 1, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexually explicit conduct, sadomasochistic abuse, physical torture or brutality and that, taken as a whole, is harmful to children.

(b) 'Harmful to children' means that quality of any description or representation, in whatever form, of nudity, sexually explicit conduct, sexual excitement, sadomasochistic abuse, physical torture or brutality, when it:

1. Predominantly appeals to the prurient, shameful or morbid interest of children;

2. Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for children; and

3. Lacks serious literary, artistic, political, scientific or educational value for children, when taken as a whole.

(c) 'Knowledge of the nature of the material' means knowledge of the character and content of any material described herein.

(d) 'Nudity' means the showing of the human male or female genitals, pubic area or buttocks with less than a full opaque covering, or the showing of the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple, or the depiction of covered male genitals in a discernibly turgid state.

518

(e) 'Person' means any individual, partnership, firm, association, corporation or other legal entity.

(f) 'Sexual excitement' means the condition of human male or female genitals when in a state of sexual stimulation or arousal.

(2) Criminal penalties. (a) Whoever, with knowledge of the nature of the material, sells, exhibits, transfers or loans to a child any material which is harmful to children, with or without monetary consideration, is guilty of a Class E felony.

(b) Whoever, with knowledge of the nature of the material, possesses material which is harmful to children with the intent to sell, exhibit, transfer or loan the material to a child is guilty of a Class A misdemeanor.

(c) It is an affirmative defense to a prosecution for a violation of this section if the defendant had reasonable cause to believe that the child had attained the age of 18 years, and the child exhibited to the defendant a draft card, driver's license, birth certificate or other official or apparently official document purporting to establish that the child had attained the age of 18 years. A defendant who raises this affirmative defense has the burden of proving this defense by a preponderance of the evidence.

(3) Extradition. If any person is convicted under sub. (2) and cannot be found in this state, the governor or any person performing the functions of governor by authority of the law shall, unless the convicted person has appealed from the judgment of contempt or conviction and the appeal has not been finally determined, demand his or her extradition from the executive authority of the state in which the person is found.

(4) Libraries and educational institutions. (a) The legislature finds that the libraries and educational institutions under par. (b) carry out the essential purpose of making available to all citizens a current, balanced collection of books, reference materials, periodicals, sound recordings and audiovisual materials that reflect the cultural diversity and pluralistic nature of American society. The legislature further finds that it is in the interest of the state to protect the financial resources of libraries and educational institutions from being expended in litigation and to permit these resources to be used to the greatest extent possible for fulfilling the essential purpose of libraries and educational institutions.

(b) No person who is an employe, a member of the board of directors or a trustee of any of the following is liable to prosecution for violation of this section for acts or omissions while in his or her capacity as an employe, a member of the board of directors or a trustee:

519

statute, as written, is substantially overbroad. He argues that it has the effect of criminally punishing those who exhibit, sell, or view material which is protected by the first amendment, including mainstream, popular literature containing explicit descriptions of sexual acts.

The doctrine of substantial overbreadth establishes an exception to the general rule that "a person to whom a statute may be constitutionally applied cannot challenge the statute on the ground that it may be unconstitutionally applied to others." *Massachusetts v. Oakes,* 491 U.S. 576, 581 (1989) (citing *Board of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 574 (1987)).

Here, Thiel argues that if sec. 948.11(2), Stats., is given its normal meaning, it is so overbroad that the sanctions of the statute will apply to conduct which the state is not entitled to regulate. *State v. Tronca,* 84 Wis.

---

1. A public elementary or secondary school.

2. A private school, as defined in s. 115.001(3r).

3. Any school offering vocational, technical or adult education that:

a. Is a vocational, technical and adult education district school, is a school approved by the educational approval board under s. 38.51 or is a school described in s. 38.51(9)(f), (g) or (h); and

b. Is exempt from taxation under section 501(c)(3) of the internal revenue code, as defined in s. 71.01(6).

4. Any institution of higher education that is accredited, as described in s. 39.30(1)(d), and is exempt from taxation under section 501(c)(3) of the internal revenue code, as defined in s. 71.01(6).

5. A library that receives funding from any unit of government.

**(5)** Severability. The provisions of this section, including the provisions of sub. (4), are severable, as provided in s. 990.001(11).

Section 948.11 was enacted as 1987 Wis. Act 332, sec. 55. As part of the revision of Wisconsin's Criminal Code, sec. 948.11 replaced sec. 944.25, Stats., which was repealed by 1987 Wis. Act 332, sec. 45, effective July 1, 1989.

2d 68, 89, 267 N.W.2d 216 (1978) (citing *State v. Starks,* 51 Wis. 2d 256, 263, 186 N.W.2d 245 (1971)). Specifically, Thiel claims that the language of sec. 948.11(2)(a) and (b), which states that an individual may not "exhibit" material which is harmful to children, has the effect of chilling legitimate activities and will "apply to fact situations where the regulation sought to be imposed would violate fundamental first-amendment rights." *Tronca,* 84 Wis. 2d at 89. We disagree and conclude that the language of sec. 948.11(2) is not overly broad and that the statute is rationally related to the compelling interest of this state to protect the well-being of its youth.

A reviewing court must view the overbreadth doctrine as " 'strong medicine' " which should be employed only "with hesitation, and then 'only as a last resort.' " *New York v. Ferber,* 458 U.S. 747, 769 (1982) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 613 (1973)). Facial challenges to a statute, such as the one Thiel makes here, do not succeed when a limiting construction is available to maintain the legislation's constitutional integrity. *Broadrick,* 413 U.S. at 613. Additionally, since sec. 948.11 encompasses both speech and conduct, the overbreadth alleged must be both real and substantial. *Id.*[9]

---

[9] Thiel does not allege that sec. 948.11, Stats., is vague. A statute which is vague has the effect of impinging upon three first amendment values: (1) it does not provide individuals with fair warning of what is prohibited; (2) lacking precise or articulated standards, it allows for arbitrary or discriminatory enforcement; and (3) it causes citizens to "forsake activity protected by the First Amendment for fear it may be prohibited." *M.S. News Co. v. Casado,* 721 F.2d 1281, 1290 (10th Cir. 1983).

The rationale underlying an overbreadth challenge includes two goals: (1) to prevent a "chilling effect" on free speech and (2) to prevent selective enforcement of a statute, which would target and discriminate against certain classes of people.[10]

A statute challenged as unconstitutionally overbroad can be "cured" by means of judicial interpretation, which provides for a narrowing and validating construction of the law. The court may also excise or sever the unconstitutional portion of the statute, leaving the rest of the legislation in force. Finally, the court may strike down the entire statute, holding it to be unconstitutional on its face. Richard H. Fallon, Jr., *Making Sense of Overbreadth,* 100 Yale L.J. 853, 886 (1991).

As this court noted in *State v. Mitchell,* 169 Wis. 2d 153, 162, 485 N.W.2d 807 (1992), *rev'd on other grounds* 113 S. Ct. 2194 (1993), "The first step in reviewing a constitutional challenge to a statute is to determine which party bears the burden of proving its constitutionality . . .." Typically, the party challenging the statute bears that burden and must prove beyond a reasonable doubt that the statute is unconstitutional.

---

[10] *See* Richard H. Fallon, Jr., *Making Sense of Overbreadth,* 100 Yale L.J. 853, 868 n.94 (1991). Fallon notes that the

[o]verbreadth doctrine rests on assumptions about uncertain and possibly shifting psychological and sociological variables such as the susceptibility of different forms of speech to deterrence by overbroad rules, the degree to which overbroad rules function as a cover for discriminatory law enforcement, and the utility of narrowly drawn statutes or limiting judicial constructions in averting chilling effects and in restraining discriminatory behavior by police and prosecutors.

*Bachowski v. Salamone,* 139 Wis. 2d 397, 404, 407 N.W.2d 533 (1987). However, the burden of proof shifts to the proponent of the statute when it has the effect of infringing upon first amendment rights. *City of Madison v. Baumann,* 162 Wis. 2d 660, 669, 470 N.W.2d 296 (1991). We believe the state in this case has successfully borne the burden of proof by showing that the regulation of materials deemed to be harmful to minors was rationally related to its compelling interest to protect the well-being of our youth. The statute properly regulates the dissemination of materials considered to be harmful to minors without unduly burdening the rights of adults to have access to these same materials.

Obscenity is not protected by the first amendment. *Roth v. United States,* 354 U.S. 476, 483 (1957). As defined in *Miller v. California,* 413 U.S. 15, 24 (1973), a work is obscene if:

> (a) ... 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . .;
>
> (b) . . . the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) . . . the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(Citations omitted.) Many states have enacted laws in order to ban or restrict the flow of obscene materials to minors. A law which prohibits a person from distributing or exhibiting to children any materials deemed to be obscene to children, but not obscene to adults, is called a variable obscenity statute. Variable obscenity

statutes reflect a state's compelling interest to protect the physical and psychological well-being of children, in general, and to protect them from obscenity, in particular. *Ferber,* 458 U.S. at 756–57.

The Wisconsin legislature created a variable obscenity statute in the context of ch. 948, Stats., which defines conduct constituting crimes against children. Specifically, sec. 948.11, Stats., has a twofold purpose, similar to variable obscenity statutes in other states: (1) to protect minors from material harmful to them as a class and (2) to protect the rights of parents to supervise the development of their children. *See also* Christopher W. Weller, *See No Evil: The Divisive Issue of Minors' Access Laws,* 18 Cumb. L. Rev. 141, 142 (1987) [hereinafter *See No Evil*] (citing Brief of Amici Curiae in Support of Appellant at 6 in *Ginsberg v. New York,* 390 U.S. 629 (1968)).

In his attack on sec. 948.11, Stats., Thiel joins the ongoing debate which has involved other variable obscenity statutes: how to resolve the competing social values of safeguarding " 'the physical and psychological well-being of a minor' "[11] without unduly burdening the individual first amendment rights of adults in a " 'real and substantial fashion.' "[12] The issue in this case, therefore, is whether sec. 948.11, Stats., is unconstitutional because it infringes upon expression guaranteed protection under the first amendment.

The United States Supreme Court, in *Ginsberg,* 390 U.S. 629, recognized the concept of "variable

---

[11] *See No Evil,* 18 Cumb. L. Rev. at 142 (quoting *Ferber,* 458 U.S. at 756–57).

[12] *Id.* (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 216 (1975)).

obscenity,"[13] which allows a state legislature or munic-ipality to ban access to materials deemed to be obscene for minors as opposed to adults. Ginsberg was con-victed under a New York law[14] for selling "girlie" magazines to minors. On appeal, Ginsberg challenged the statute and argued that "the scope of the constitu-tional freedom of expression secured to a citizen to read or see material concerned with sex [could not] be made to depend upon whether the citizen is an adult or minor." *Id.* at 636. The Supreme Court held, however, that New York's variable obscenity standard was con-stitutional, and the statute "simply adjust[ed] the definition of obscenity 'to social realities by permitting the appeal of [material concerned with sex] to be assessed in terms of the sexual interests . . .' of . . .

---

[13] The concept of "variable obscenity" was developed by Wil-liam B. Lockhart and Robert C. McClure in *Censorship of Obscenity: The Developing Constitutional Standards,* 45 Minn. L. Rev. 5 (1960). The authors state that "[v]ariable obscenity . . . furnishes a useful analytical tool for dealing with the problem of denying adolescents access to material aimed at a primary audi-ence of sexually mature adults. For variable obscenity focuses attention upon the make-up of primary and peripheral audi-ences in varying circumstances, and provides a reasonably satisfactory means for delineating the obscene in each circum-stance." *Id.* at 85.

[14] New York Penal Law sec. 484–h.1(f) stated that "harmful to minors" meant having a quality that

 (i) predominantly appeals to the prurient, shameful or mor-bid interest of minors, and

 (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

 (iii) is utterly without redeeming social importance for minors.

*Ginsberg,* 390 U.S. at 646.

minors." *Id.* at 638 (quoting *Mishkin v. New York,* 383 U.S. 502, 509 (1966)). Consequently, "even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults . . ..' " *Id.* (quoting *Prince v. Massachusetts,* 321 U.S. 158, 170 (1944)).

The ability to regulate a minor's exposure to materials considered to be harmful is justified by two compelling state interests. First, the state maintains the desire to safeguard the well-being of youth, an interest within the state's constitutional powers of regulation. We recognize the basic right of parents to nurture, raise and direct the development of their children. *Ginsberg,* 390 U.S. at 639. Therefore, the legislature can properly conclude that parents, teachers and others who have the primary responsibility for the development of children are entitled to support by means of legislation designed to aid them in fulfilling that obligation.

Second, the state has an independent interest in the well-being of its youth. Our children are the future of this country. Since parents are not always in a position to shield their children from exposure to obscene materials, the state is justified in regulating the exhibition of those types of materials to minors. Such regulation reflects the legitimate interest in protecting minors from materials deemed to be harmful to their welfare.

■
Therefore, "[t]o sustain state power to exclude material defined as obscenity . . . requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors." *Id.* at 641. A state may prohibit the distribution of sexually explicit

materials to children, even though the materials would not be considered obscene if they were distributed to an adult. *Id.* at 636–37.

The *Ginsberg* decision sparked a proliferation of variable obscenity statutes across the country. Many states later modified their laws to move beyond the ruling in *Ginsberg* in order to regulate the sale *and display* of material harmful to minors. The United States Supreme Court held that, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick,* 413 U.S. at 615. Therefore, a variable obscenity statute must not substantially impair the access of adults to protected materials.

These statutes must also require scienter in order to "avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity." *Mishkin,* 383 U.S. at 511.

Recent constitutional challenges to variable obscenity statutes have focused upon the *scope* of the imposed prohibitions. *See No Evil,* 18 Cumb. L. Rev. at 149 n.58. In *M. S. News Co. v. Casado,* 721 F.2d 1281 (10th Cir. 1983), the Tenth Circuit Court of Appeals addressed the constitutionality of a Wichita, Kansas, ordinance[15] designed to prevent minors from being

---

[15] The display component of sec. 5.68.156(2) to ordinance number 36–172 of the Code of the City of Wichita, Kansas, provided:

(2) *Offenses.* No person having custody, control or supervision of any commercial establishment shall knowingly:

(a) display material which is harmful to minors in such a way that minors, as a part of the invited general public, will be exposed

exposed to sexually oriented materials that were harmful to them. *Id.* at 1285.[16] At the heart of the statute was a prohibition against the dissemination and display of obscene materials and the manner in which commercial establishments could *comply* with the prohibition.[17] The court concluded that the ordinance,

to view such material provided, however, a person shall be deemed not to have 'displayed' material harmful to minors if the material is kept behind devices commonly known as 'blinder racks' so that the lower two-thirds of the material is not exposed to view.

(b) Sell, furnish, present, distribute, allow to view, or otherwise disseminate to a minor, with or without consideration, any material which is harmful to minors; or

(c) Present to a minor or participate in presenting to a minor, with or without consideration, any performance which is harmful to a minor.

*Casado,* 721 F.2d at 1296–97.

[16] The Wichita ordinance incorporated the *Miller* test. The Supreme Court in *Miller* rejected the "utterly without social value" test enunciated as a constitutional standard in *Memoirs v. Massachusetts,* 383 U.S. 413, 419 (1966). However, variable obscenity statutes in various jurisdictions applied whatever was the current test for obscenity, either under *Memoirs* or *Miller,* in order to define what materials were harmful to minors. *Casado,* 721 F.2d at 1286 n.4.

[17] We take note of two other commercial display cases. In *Upper Midwest Booksellers v. City of Minneapolis,* 780 F.2d 1389 (8th Cir. 1985), the court examined a municipal ordinance which required the use of opaque covers in addition to "blinder racks" so as to shield certain materials from a minor's view. The court concluded that only the manner of display was affected, not the dissemination of materials to adults. Therefore, no violation of the first amendment existed.

By contrast, in *Tattered Cover, Inc. v. Tooley,* 696 P.2d 780 (Colo. 1985), the court held that the commercial display provision of the statute was not sufficiently narrowly drawn so as to have only an incidental effect on the sale and display of adult materials. The statute was found to be facially invalid because

which regulated conduct plus speech,[18] was not facially invalid, since the alleged overbreadth was not substantial. *Id.* at 1289 (citing *Broadrick,* 413 U.S. at 615).

In 1990, the Court of Appeals for the Eleventh Circuit upheld as constitutional a Georgia statute which made it a criminal offense to display, in a place accessible to minors, any material deemed harmful to minors under the statute.[19] *American Booksellers v.*

---

the applicable severability statute was not capable of validating inoffensive provisions.

[18] The display regulation in the ordinance constituted conduct plus speech, since the *manner* in which material could be disseminated was regulated.

[19] Ga. Code Ann. secs. 16–12–103 and 16–12–104 provided, in relevant part, as follows:

16–12–103. Selling, loaning, or exhibiting.

(a) It shall be unlawful for any person knowingly to sell or loan for monetary consideration or otherwise furnish or disseminate to a minor:

(1) Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; or

(2) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors.

(b) It shall be unlawful for any person knowingly to sell or furnish to a minor an admission ticket or pass or knowingly to admit a minor to premises whereon there is exhibited a motion picture, show, or other presentation which, in whole or in part, depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors or exhibit any such motion picture at any such premises which are not designed to prevent viewing from any public way of such motion picture by minors not admitted to any such premises.

*Webb,* 919 F.2d 1493 (11th Cir. 1990). In its analysis, the court considered the same conflict present in the application of other variable obscenity statutes:

(c) It shall be unlawful for any minor falsely to represent to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that such minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(d) It shall be unlawful for any person knowingly to make a false representation to any person mentioned in subsection (a) or subsection (b) of this Code section or to his agent that he is the parent or guardian of any minor or that any minor is 18 years of age or older with the intent to procure any material set forth in subsection (a) of this Code section or with the intent to procure such minor's admission to any motion picture, show, or other presentation, as set forth in subsection (b) of this Code section.

(e) It shall. be unlawful for any person knowingly to exhibit, expose, or display in public at newsstands or any other business or commercial establishment or at any other public place frequented by minors or where minors are or may be invited as part of the general public:

(1) any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct, or sadomasochistic abuse and which is harmful to minors; *or*

(2) any book, pamphlet, magazine, printed matter however reproduced, or sound recording which contains any matter enumerated in paragraph (1) of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse and which, taken as a whole, is harmful to minors . . ..

16–12–104. Library exception.

The provisions of the Code Section 16–12–103 . . . shall not apply to any public library operated by the state or any of its political subdivisions nor to any library operated as a part of any school, college, or university. . . .

*American Booksellers v. Webb,* 919 F.2d 1493, 1513–14 (11th Cir. 1990).

On the one hand, a state's interest in protecting children from exposure to material obscene as to minors is a substantial and important state interest . . . .. On the other hand, the indirect burden on adults' First Amendment right to have access to material not obscene for adults must be narrowly drawn.

*Id.* at 1501.

The court concluded that the Georgia statute was "readily susceptible to a narrowing construction that [would reduce] the scope of the materials covered [and produced] only a slight burden on adults' access to protected material, and fully comport[ed] with the First Amendment." *Id.* at 1495 (footnote omitted).

In *Casado, Webb, Upper Midwest,* and *Tattered Cover,* the courts' focus was the impact of variable obscenity statutes upon the commercial display of materials deemed harmful to minors, but not obscene for adults. In *Webb,* for example, appellees argued that the Georgia statute's definition of harmful to minors was overbroad because it established a single standard for all minors, without distinction as to maturity levels. The consequence, according to appellees, was that older minors would be denied access to materials with serious literary value. *Webb,* 919 F.2d at 1504.

However, the Georgia statute did not deny access to "reasonable minors." *See Pope v. Illinois,* 481 U.S. 497 (1987).[20] In fact, the statute did not affect materi-

---

[20] In *Pope,* the Court stated that

[t]he proper inquiry is not whether an ordinary member [of the community] would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a *reasonable person* would find such value in the material, taken as a whole.

*Id.* at 500–01 (emphasis added). Both the courts in *Webb* and *American Booksellers Ass'n, Inc. v. Com. of Virginia,* 882 F.2d

als which were protected as to minors, since " 'if a work is found to have serious literary, artistic, political, or scientific value for a legitimate minority of normal, older adolescents, then it cannot be said to lack such value for the entire class of juveniles taken as a whole.' " *Webb,* 919 F.2d at 1505 (quoting *American Booksellers Ass'n, Inc. v. Com. of Virginia,* 882 F.2d 125, 127 (4th Cir. 1989), *cert. denied* 494 U.S. 1056 (1990)). The narrowing construction given to the statute by the court had the effect of dramatically reducing the amount of material covered by the ban and lessening the indirect burden borne by adults. *Id.*

In the case before us, Thiel argues that Wisconsin's variable obscenity statute, sec. 948.11, Stats., is facially invalid. He contends that the statute unduly burdens the first amendment right of adults to sell, view, or examine materials which have been statutorily defined as harmful to minors. The United States Supreme Court has stated:

> It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld . . . .. The key to application of this principle is that the statute must be 'readily susceptible' to the limitation; we will not rewrite a state law to conform it to constitutional requirements.

*Virginia v. American Booksellers Assn.,* 484 U.S. 383, 397 (1988) (citations omitted).[21]

---

125, 127 (4th Cir. 1989), *cert. denied* 494 U.S. 1056 (1990), adapted the *Pope* "reasonable person" test to create the reasonable minor test, when assessing what is harmful to minors.

[21] Booksellers challenged the constitutionality of a Virginia statute which prohibited the display of certain sexually explicit

We agree with the *Webb* court's analysis of the overbreadth doctrine as well as the fact that consideration must be given to

> the allegations of the potential range of materials covered by the statute, and the possible burdens on adults' access imposed by mandatory compliance measures, in light of our twin obligations to (1) construe the statute narrowly, (2) without rewriting its terms.

*Webb,* 919 F.2d at 1500. We conclude that sec. 948.11, Stats., can be narrowly construed and is not unconstitutionally overbroad. The statute has, in fact, struck a proper balance between this state's compelling interest

---

materials in a manner whereby juveniles could examine and peruse them. The United States District Court for the Eastern District of Virginia found the statute to be unconstitutional. The Court of Appeals for the Fourth Circuit affirmed. The U.S. Supreme Court then certified two questions to the Virginia Supreme Court:

1. Did the phrase "harmful to juveniles" encompass any of the materials introduced at trial, and what general standard should be used to determine the Virginia statute's reach, in light of the differing ages and levels of maturity of the juveniles covered by the statute?

2. Does a bookseller comply with the statute when the bookseller prohibits juvenile examination of materials covered by the statute, when observed by the bookseller, but otherwise takes no action regarding the display of restricted materials? *Virginia v. American Booksellers Assn,* 484 U.S. at 398.

Following the Virginia Supreme Court's decision on those certified questions, the case was remanded to the Court of Appeals for the Fourth Circuit, which reversed its previous decision and held that the Virginia statute was not unconstitutionally vague. *American Booksellers Ass'n,* 882 F.2d at 126.

to protect the physical and psychological well-being of our youth while not precluding adult access to materials deemed to be harmful to minors though not obscene for adults. Contrary to Thiel's argument that sec. 948.11 could be used to ban virtually any book which discusses or describes sexual activity, the statute defines as obscene for minors only those materials which "[lack] serious literary, artistic, political, scientific or educational value for children, when taken as a whole." Section 948.11(1)(b)3, Stats.

The legislature has narrowly drafted sec. 948.11, Stats., so as to have only an incidental effect on the rights of adults to view materials considered not to be obscene for them. The language of the statute reflects the state's compelling interest to protect the well-being of its youth by examining the *nature* of the materials.[22] Once the nature of the materials is deemed to be harm-

[22] Section 948.11 has been somewhat of a "work in progress" since 1957. At that time, the legislature enacted sec. 947.08, Stats., which sought to regulate the sale and distribution of salacious publications which stimulated juvenile delinquency. In 1969, that statute was replaced by sec. 944.25, Stats. The act that created sec. 944.25—ch. 405, Wis. Laws of 1969—stated the following purpose:

SECTION 1. *PURPOSE AND INTENT OF ACT.* During the past several years the sale or distribution of harmful materials to minors has become a matter of increasingly grave concern to the people of this state. The elimination of such sales and the consequent protection of minors from harmful materials are in the best interests of the morals and general welfare of the citizens of this state, in general, and of minors in this state, in particular. The accomplishment of these ends can best be achieved by providing public prosecutors with a speedy civil remedy for obtaining a judicial determination of the character and contents of publications, with an effective power to enjoin promptly the sale of harmful materials to minors and with an effective power to commence criminal proceedings against persons who regularly engage in the sale of harmful materials to minors.

ful, by application of the *Miller* test, an individual may not—in a public or private forum—sell, loan, exhibit, or transfer harmful materials to minors. Each of the terms in sec. 948.11(2)(a) and (b), Stats.,—"sell," "loan," "exhibit," and "transfer"—represents a knowing and affirmative act. Contrary to Thiel's argument, the term "exhibit" does not constitutionally imperil sec. 948.11. Rather, we construe "exhibit" to mean "to offer or present for inspection." *See Black's Law Dictionary* 573 (6th ed. 1990). Distinct from those cases involving the commercial display of materials to a general, consumer audience, the language of sec. 948.11 focuses upon the affirmative conduct of an individual toward a specific minor or minors. Therefore, an individual violates the statute if he or she, aware of the nature of the material, knowingly offers or presents for inspection to a specific minor or minors material defined as harmful to children in sec. 948.11(1)(b).

In sec. 948.11(1)(b), Stats., the legislature adapted the *Miller* test of obscenity to produce a definition of what may be considered harmful to children. The first two prongs of the test—appeal to prurient interest and patent offensiveness—are analyzed by applying contemporary community standards. *See Smith v. United States,* 431 U.S. 291 (1977). However, the third prong

---

Section 944.25 was enacted shortly after the *Ginsberg* decision, adapting the *Roth-Memoirs* test for obscenity used in the New York variable obscenity statute. It is worth noting that on June 11, 1969, an amendment was introduced in the Senate which called for the insertion of the word "exhibit" in some form to follow the terms "sell" and "distribute" elsewhere in the statute. No specific rationale for the addition of the term "exhibit" was included in the legislative history.

By 1987, sec. 948.11, Stats., was in place, adapting the *Miller* test to identify materials harmful to minors.

requires a separate analysis: does the material have literary, artistic, political, or scientific value? The appropriate standard at this point is "whether a reasonable person would find such value in the material, taken as a whole." *Pope,* 481 U.S. at 501. Therefore, the appropriate standard to apply under this statute is whether material defined as harmful has any serious literary, artistic, political, scientific, or educational value, when taken as a whole. Such value is assessed by a *reasonable minor of like age to the minor to whom the material is exhibited.*

The state has successfully borne the burden of proving that sec. 948.11, Stats. does not unconstitutionally encroach upon the first amendment rights of adults. *See Mitchell,* 169 Wis. 2d at 163. The statute has properly adapted the *Miller* obscenity standard to determine what materials are harmful to minors so as to allow the state to protect the well-being of youth without unduly burdening the first amendment rights of adults to view, sell, or examine materials not considered obscene or harmful for them.

### NONCERTIFIED ISSUES

Thiel argues that sec. 948.11(4), Stats., violates his right to equal protection of the laws guaranteed by the fourteenth amendment to the United States Constitution and art. I, sec. 1 of the Wisconsin Constitution because it exempts public libraries, educational institutions, and their employees and directors from prosecution under sec. 948.11. He claims that sec. 948.11(4) should, therefore, be subject to strict scrutiny because of its abridgement of the freedom of expression guaranteed by the first amendment.

We disagree. We have found sec. 948.11, Stats., to be a constitutional variable obscenity statute. A valid

obscenity statute does not punish the exercise of a fundamental right. Strict scrutiny is an inappropriate standard in this case since the sale, exhibit, transfer or loan of materials, defined as obscene or harmful to minors under sec. 948.11(1)(b), Stats., is not protected by the first amendment. *See Roth,* 354 U.S. at 484–85. "If the state has a rational basis for concluding that a legitimate interest will be served by the classification, it may create distinctions between the rights of persons and entities to engage in conduct not protected by the Constitution." *Webb,* 919 F.2d at 1511 (citing *San Antonio School District v. Rodriguez,* 411 U.S. 1, 29 (1973)). Section 948.11(4), which provides a statutory exemption for libraries and educational institutions, is rationally related to the fundamental purpose of the legislation.

Similar to the legislation at issue in *Webb,* sec. 948.11(4), Stats, exempts a library or educational institution from the statutory restrictions which prohibit an individual from selling, loaning, transferring, or exhibiting to minors materials defined as harmful to them. At the heart of this legislation is the understanding that libraries and educational institutions differ significantly in purpose and motivation from individual or commercial purveyors of obscene or harmful material. Section 948.11(4)(a) states in part:

> The legislature finds that the libraries and educational institutions under par. (b) carry out the essential purpose of making available to all citizens a current, balanced collection of books, reference materials, periodicals, sound recordings and audiovisual materials that reflect the cultural diversity and pluralistic nature of American society.

537

As contrasted to commercial entities which engage in the dissemination of obscene or harmful materials for profit or private individuals who exhibit such materials for personal gratification, libraries and educational institutions maintain a variety of works, for reference or educational purposes.[23] Because these collections reflect the cultural diversity and popular culture of society, as well as a myriad of individual tastes, they are monitored by librarians and teachers who are trained in identifying the appropriate audience for their use. Thus,

> [t]he legislature further finds that it is in the interest of the state to protect the financial resources of libraries and educational institutions from being expended in litigation and to permit these resources to be used to the greatest extent possible for fulfilling the essential purpose of libraries and educational institutions.

Section 948.11(4)(a), Stats.

Contrary to Thiel's argument that libraries and educational institutions will be permitted to engage in activity considered to be unlawful for any other individual or commercial entity,

> [t]he constitutional protection accorded to the right which the legislature classifies—and thus judicial

---

[23] In *Kucharek v. Hanaway,* 902 F.2d 513, 520 (7th Cir. 1990), the court noted that:

> Libraries and schools are not in the business of purveying or exhibiting pornographic materials. They are, however, frequent targets of private citizens concerned, sometimes in an ignorant and narrow-minded way, with the exposure of their children to immoral influences . . .. The purpose of the exemption is to shield libraries and schools from groundless complaints of disseminating obscene materials, and is rational.

scrutiny of the classification—should depend not on broad propositions such as 'free speech is fundamental,' or 'obscenity is unprotected,' but, rather, on the specific nature of the conduct that the legislature has decreed one group may engage in, while a separate class may not.

*Webb,* 919 F.2d at 1511. The purpose of sec. 948.11, Stats., is to enjoin conduct by individuals or commercial entities which is designed to appeal to the prurient interest of minors. We conclude that the exemption provided in the statute is reasonable and serves a "legitimate public purpose or set of purposes based on some conception of the general good." Laurence H. Tribe, *American Constitutional Law* sec. 16–2 at 1440 (2d ed. 1988). *See also* Joseph Tussman and Jacobus tenBroeck, *The Equal Protection of the Laws,* 37 Cal. L. Rev. 341 (1949).

Finally, the classification itself is not inherently suspect, i.e., it was not based upon a suspect distinction such as race. Consequently, "the Equal Protection Clause is not offended by an under-inclusive or over-inclusive restriction on one's ability to engage in conduct that is not protected by the Constitution." *Webb,* 919 F.2d at 1511 (citing *United States v. Thornton,* 901 F.2d 738 (9th Cir. 1990)).

Thiel has also challenged the sufficiency of the factual allegations underlying the charge of attempt to expose a child to harmful material, in violation of secs. 948.11(2)(a) and 939.32(1), Stats., in Count 2 of the amended complaint. This challenge extended, as well, to the preliminary hearing, wherein he claimed a lack of evidence sufficient to support a bindover for trial. A review of the bindover determination is made *de novo* by this court. *State v. Moats,* 156 Wis. 2d 74, 84, 457

N.W.2d 299 (1990) (citing *State v. Williams,* 104 Wis. 2d 15, 22, 310 N.W.2d 601 (1981)). Specifically, Thiel claims that the state alleges no acts committed by him other than asking J.L.L. if she would like to watch "dirty movies" in the back room. Thiel asserts that when J.L.L. declined his invitation and left the store, he committed no overt acts to detain her. Therefore, he maintains that his verbal invitation does not satisfy both prongs of the crime of attempt: "a criminal *intent* and some *acts* in furtherance of the intent." *State v. Cooper,* 127 Wis. 2d 429, 431, 380 N.W.2d 383 (Ct. App. 1985) (emphasis added). We conclude, however, that the facts in the amended complaint and the evidence presented at the preliminary hearing were sufficient to support a charge of attempt and a bindover for trial.

Section 939.32(3), Stats., provides:

> An attempt to commit a crime requires that the actor have an intent to perform acts and attain a result which, if accomplished, would constitute such crime and that he does acts toward the commission of the crime which demonstrate unequivocally, under all the circumstances, that he formed that intent and would commit the crime except for the intervention of another person or some other extraneous factor.

In *State v. Stewart,* 143 Wis. 2d 28, 420 N.W.2d 44 (1988), this court interpreted sec. 939.32(3) to mean that in order to prove attempt,

> the state must prove an intent to commit a specific crime accompanied by sufficient acts to demonstrate unequivocally that it was improbable the accused would desist of his or her own free will. The intervention of another person or some other extraneous factor that prevents the accused from

> completing the crime is not an element of the crime of attempt. If the individual, acting with the requisite intent, commits sufficient acts to constitute an attempt, voluntary abandonment of the crime after that point is not a defense.

*Id.* at 31. Thiel argues that he had not taken sufficient steps in furtherance of the crime charged, since he had only asked J.L.L. if she wanted to watch dirty movies in the back room. However, "[i]ntent may be inferred from the defendant's conduct, including his words and gestures taken in the context of the circumstances." *Id.* at 35 (citing *Jacobs v. State,* 50 Wis. 2d 361, 366, 184 N.W.2d 113 (1971), and *Adams v. State,* 57 Wis. 2d 515, 519, 204 N.W.2d 515 (1973)). Here, Thiel's verbal invitation was subsequent to his showing J.L.L. the booklet "Sexual Secrets of the Zodiac," which contained pictures of men and women engaged in sexual intercourse. In combination with the sex toys and pornographic videos recovered during the search of the residence and store, reasonable inferences may be drawn that Thiel possessed materials deemed harmful to children and intended to exhibit them to J.L.L. Thiel's failure to actually show J.L.L. the "dirty movies" in the back room does not mean that the intent to do so was not present.

Additionally, the conduct element of attempt under sec. 939.32(3), Stats., was satisfied when J.L.L. left Thiel's store after becoming worried by his suggestions. Thiel's conduct up to that point demonstrated that only a circumstance beyond his control prevented the commission of the crime. *Stewart,* 143 Wis. 2d at 42.

In *State v. Olson,* 75 Wis. 2d 575, 250 N.W.2d 12 (1977), this court stated that

a complaint is a self-contained charge. The document itself must set forth facts which, together with any reasonable inferences therefrom would lead a reasonable person to conclude that a crime had probably been committed and that the defendant named in the complaint was probably the culpable party.

*Id.* at 580–81 (citing *State v. Haugen,* 52 Wis. 2d 791, 793, 191 N.W.2d 12 (1971). The test applied to assess the sufficiency of a complaint is that it must be minimally adequate in setting forth the essential facts which establish probable cause. Minimal adequacy is evaluated using common sense as opposed to hypertechnical means. *Id.* (citing *State ex rel. Evanow v. Seraphim,* 40 Wis. 2d 223, 226, 161 N.W.2d 369 (1968), and *State v. Elson,* 60 Wis. 2d 54, 58, 208 N.W.2d 363 (1973)).

The amended complaint clearly describes the entire incident, including a completed crime of exposing harmful materials to a child, as alleged in Count 1. The allegations in the complaint also include statements of the minor child and inculpatory statements made by Thiel.

Thiel also contends that there was insufficient evidence presented at the preliminary hearing to support an attempted violation of sec. 948.11, Stats., under the attempt statute, sec. 939.32, Stats. Again, Thiel asserts there was no evidence presented at the preliminary hearing with regard to overt acts relating to his offer to show J.L.L. "dirty movies," only an alleged offer. Furthermore, he claims that the state has failed to prove any specific representations made to J.L.L. which would be considered "harmful to children" in violation of sec. 948.11, warranting a bindover for trial. Thus, Thiel argues, Count 2 of the information should have

been dismissed by the circuit court. We disagree and conclude that sufficient evidence existed at the preliminary hearing to support Thiel's bindover for trial. Sufficient evidence, in the form of testimony and exhibits, existed to support a bindover of Thiel on both counts.[24]

Finally, Thiel challenges the search warrant and supporting affidavit, claiming that the warrant was not supported by probable cause and was not reasonably specific so as to satisfy fourth amendment scrutiny.

We disagree with both challenges. First, we conclude that J.L.L.'s detailed statement to the Sheboygan police that Thiel exhibited to her "Sexual Secrets of the Zodiac," her description of the booklet's contents and of Thiel's conversation with her about watching "dirty movies" in the back room was sufficient to " 'excite an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that the objects sought will be found in the place to be searched.' " *State v. Edwards,* 98 Wis. 2d 367, 373, 297 N.W.2d 12 (1980) (quoting *State v. Starke,* 81 Wis. 2d 399, 408, 260 N.W.2d 739 (1978)). The magistrate properly issued the warrant, applying the "totality of the circumstances" test enunciated in *Gates,* 462 U.S. at 230. The task of the magistrate in applying this test is to "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . a fair probability [exists] that contraband or evidence of a crime will be found in a particular place." *Id.* at 238.

---

[24] The record of the preliminary hearing contains testimony from J.L.L. and Sheboygan Police Detective Sorensen, who interviewed J.L.L. and executed the search warrant. The record also contains one of the videotapes seized from Thiel's residence.

Second, the warrant executed in this case cannot be described as a general warrant. Rather, it was reasonably specific in order to satisfy fourth amendment scrutiny.[25] Given the age of J.L.L. at the time of the incident and her description of the booklet exhibited to her by Thiel, the search warrant described items to be seized "with as much particularity and specificity as the circumstances and the nature of activity under investigation permitted." *State v. Petrone,* 161 Wis. 2d 530, 541, 468 N.W.2d 676 (1991). Some of the items ultimately seized under the warrant included the "Sexual Secrets of the Zodiac" booklet, adult videotapes, a box containing penis-shaped suckers, various sex toys, and a cartoon depicting Bart Simpson engaging in fellatio with a small child. Each of these items could satisfy the statutory definition of materials harmful to children. Contrary to Thiel's argument, these items were not seized for the purpose of destroying them or restricting his access to adult materials. Rather, they were seized so as to be preserved as evidence in a criminal proceeding arising out of Thiel's alleged unlawful conduct.

---

[25] The search warrant, executed on September 16, 1991, called for a search of the C&M Specialty Sales store as well as the residence of Marvin Thiel. In the search of any storage areas, rooms, or storage containers inside or outside the building, police were to examine

> films, videos, books, magazines or single photographs depicting naked men and/or women and/or depicting explicit sexual activity between one or more persons, various identifiers, and any implements or machines used to display or view films, video tapes, books, magazines or pictures, which property was used in the commission of, or may constitute evidence of, a crime, to wit: exposing a child to harmful material in violation of section 948.11(2) of the Wisconsin Statutes and child enticement in violation of section 948.07 of the Wisconsin Statutes.

*By the Court.*—The orders of the circuit court are affirmed in part and reversed in part, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

SHIRLEY S. ABRAHAMSON, J. *(dissenting in part and concurring in part).* In accordance with the views I express today in *Walkowiak v. State,* 183 Wis. 2d 478, 491, 515 N.W.2d 847 (1994), I write separately to state that I agree with the circuit court that the defendant's statements should be suppressed. The waiver of rights signed by the defendant in this case is invalid as a matter of law.

Circuit court judge Gary Langhoff explained the circuit court's position and mine very well as follows:

">. . . in a case such as this, an appropriate response to the .question, "Do you think I need a lawyer," would be to inform the suspect that the decision is one for him or her to make . . ., *and then to ask for a decision . . .* . Detective Sorenson's response to Thiel's equivocal expression of interest in counsel was insufficient to protect Thiel's right to counsel under *Edwards.* Detective Sorenson began to clarify the defendant's equivocal response by informing him that the decision was solely the defendant's to make. After imparting this information to the defendant, Sorenson failed to ask defendant Thiel what his decision was. Detective Sorenson merely waited for Thiel to sign the waiver form. The detective neglected to clarify Thiel's ambiguous request for counsel. Mere signing of a waiver statement after a request for counsel has been made is not a valid waiver . . .." (emphasis in original; citations omitted). Memorandum Decision, p. 13.